Johnson v. Perry

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2016

(Argued:  October 17, 2016				Decided:  June 8, 2017)

Docket No. 15-3671

_____

NORMAN JOHNSON,

*Plaintiff-Appellee*,

- v. -

STEPHEN D. PERRY,

*Defendant-Appellant*.

_____

Before:  KEARSE, JACOBS, and LOHIER, *Circuit Judges*.

Appeal from an interlocutory order of the United States District Court for the District of Connecticut, Warren W. Eginton, *Judge*, which principally denied defendant school principal's qualified-immunity-based motion for summary judgment dismissing a claim that defendant violated plaintiff's First Amendment right of freedom of assembly in banning plaintiff from attending virtually all school events, on or off school property, because of his opposition to defendant's bullying and harassing efforts to compel plaintiff's daughter to remain a member of the school's varsity girls basketball team.  The district court denied defendant's summary judgment motion on the ground that

his entitlement to qualified immunity could not be determined without the resolution of genuinely disputed questions of fact; the court also *sua sponte* revived a previously dismissed claim that defendant's actions violated plaintiff's right to due process, and *sua sponte* ruled that there existed genuine issues of material fact to be tried with respect to that claim as well. On appeal, defendant contends that as to both constitutional claims he was entitled to qualified immunity as a matter of law, even on the basis of the facts as plaintiff views them. As to the due process claim, we conclude that the district court's rulings are not within the scope of defendant's notice of appeal. As to the First Amendment claim, we conclude that defendant's motion for summary judgment was properly denied insofar as plaintiff complains of being banned from events beyond school property and from sports contests on school property to which the public is invited, but that defendant is entitled to qualified immunity as a matter of law to the extent that plaintiff complains of being otherwise banned from school property.

Affirmed in part and reversed in part; appeal dismissed in part.

JOHN R. WILLIAMS, New Haven, Connecticut, *for Plaintiff-Appellee*.

LORI A. MIZERAK, Office of Corporation Counsel for the City of Hartford, Hartford, Connecticut, *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Stephen D. Perry, the principal of Capital Preparatory Magnet School ("Capital Prep") in Hartford, Connecticut, appeals from an interlocutory order of the United States District Court for the District of Connecticut, Warren W. Eginton, *Judge*, denying Perry's qualified-immunity-based motion to dismiss, by summary judgment, plaintiff Norman Johnson's claims that his First Amendment right of freedom of assembly and his state-law right to be free from the intentional infliction of emotional distress were violated by Perry in banning Johnson from attending virtually all Capital Prep events, on or off school property, because of his opposition to Perry's bullying and harassing efforts to compel Johnson's daughter to remain a member of the girls varsity basketball team. The district court denied Perry's summary judgment motion on the ground that his entitlement to qualified immunity cannot be determined without the resolution of genuinely disputed questions of material fact as to motivation and reasonableness; the court also *sua sponte* revived a previously dismissed claim that Perry's actions violated Johnson's right to due process, and it noted that there exist genuine issues of material fact to be tried with respect to that claim as well. On appeal, Perry challenges the court's decisions on the First Amendment and due process claims, contending that he is entitled to qualified immunity as a matter of law, even on the basis of the facts as Johnson views them.

For the reasons that follow we dismiss the appeal insofar as it pertains to the claimed due process violation (*see* Part II.A.1. below). Insofar as the appeal pertains to the First Amendment claim, we conclude that Perry's motion for summary judgment was properly denied insofar as Johnson complains of being banned from events beyond school property and from sports contests on school

property to which the public is invited, but that Perry is entitled to qualified immunity as a matter of law to the extent that he banned Johnson from school property otherwise.

# I. BACKGROUND

As this is an appeal from the denial of summary judgment, we view the record in the light most favorable to Johnson as the party against whom summary judgment was sought. And we describe the events giving rise to this action as Johnson contends they occurred, given Perry's assertion of the right to take this interlocutory appeal on the basis of "the plaintiff's version of the facts" (Perry brief on appeal at 4, 9).

A. *Johnson's Daughter Withdraws From the Varsity Basketball Team*

In 2011-2013, Johnson's daughter (to whom we refer as "JD") was a student at Capital Prep. Capital Prep required its students to participate in two sports. One of the sports in which JD participated was basketball. In her junior and senior years, she was a member of both the junior varsity ("JV") and varsity teams; but on the varsity team she received very little playing time. Both Johnson and his wife Bonnie Johnson ("Bonnie") urged varsity basketball coach Tammy Millsaps to allow JD to play more. Johnson approached Millsaps at numerous practices and games; he said he could work with JD and asked what he needed to do to improve her play. Millsaps responded simply that she would not guarantee anyone any amount of playing time. (*See*, *e.g.*, Deposition of Norman Johnson ("Johnson Dep."), at 23-25.)

JD, dissatisfied with her lack of playing time and with Millsaps's coaching, told her parents she felt she was being treated unfairly. In January 2013, in her senior year, she no longer wanted to be a member of the varsity team and wanted to be only on the JV team, where she actually got an opportunity to play the game. Her parents said they would support her decision whatever it was.

After a varsity basketball game on Saturday January 26, Johnson attempted once again to speak with Millsaps about more playing time for his daughter. When Millsaps responded that she didn't have time and would talk to him some other time, Johnson told Millsaps that from that moment on, JD would not be a member of the varsity team and would be playing only on the JV team. (*See* Johnson Dep. 38; *id*. at 71 ("I said, That's okay. You don't have to worry about it. She's not playing for you no more. . . . She'll just play JV.").)

Prior to the end of that game, Johnson and Bonnie had been discussing their intention to speak to Millsaps about more playing time for JD. They were overheard by another Capital Prep player's mother, who chastised them for expecting JD to play in as "fast paced [a] game as this" (January 31, 2013 email from Bonnie to Perry) or in "a high profile game like this" (Johnson Dep. 70). Johnson told the other mother that he did not appreciate her comment, but he did not get into an argument with her. (*See id*.) The parties dispersed without incident; but during the evening Bonnie received from the other mother "threa[ten]ing Instagram messages" (January 31, 2013 email from Bonnie to Perry) and texts to the effect that JD's playing "sucked" (Johnson Dep. 70).

The Johnsons, concerned that JD and the other player, when they next met, might get into a fight (*see, e.g., id*. at 38), asked to meet with Millsaps, Perry, and the school's Director of

5

Athletics, Chris Fulton. Bonnie and JD thereafter met with Millsaps and Fulton, but Perry did not attend. The discussion centered on JD's desire to withdraw from the varsity team. According to Bonnie's January 31 email to Perry, Millsaps did not contribute to the discussion at that meeting; but after Bonnie departed, Millsaps met with JD alone, said she could not guarantee JD any playing time, and said she viewed the entire incident as petty. Bonnie requested another meeting.

Johnson, Bonnie, and JD then met with Fulton. Perry was again invited, but did not attend. The Johnsons and Fulton amicably discussed JD's desire to be only on the JV team, where she could play, and not to be a member of the varsity team. At that meeting, "[e]verything was settled," meaning that JD "was going to play JV, and that was it." (Johnson Dep. 27.)

Nonetheless, Perry, who had declined the previous requests to attend meetings with JD and her parents, thereafter proceeded repeatedly to summon JD from her classes to meet with him in his office in the absence of her parents. In a span of five school days, Perry called JD to his office four times. With Fulton in attendance, Perry attempted to bully JD into remaining a member of the varsity team. JD--who recorded Perry's statements--reported to her parents that Perry "told [JD] that she better suit up and he didn't want to hear nothing about it no more, that she was going to play" varsity basketball. (Johnson Dep. 30-31.)

Perry's actual opinion, later acknowledged at a meeting attended by Perry, Johnson, Bonnie, JD, and the president of Hartford's Parent Teacher Organization ("PTO"), was that JD's basketball skills, while good, were "not good enough [for] play at a varsity championship level" (Johnson's Answer to Perry Interrogatory No. 2). But Perry needed JD to remain on the varsity roster so that the team would be eligible to compete for the state championship (*see* Johnson Dep. 19-20);

6

hence, JD was being harassed to stay on the team while being told "you will be playing varsity, and I'm not going to guarantee you any playing time" (*id*. at 72).

On the night of February 6, the Johnsons sent Perry an email protesting his conduct, requesting a meeting, and demanding that he end the "bullying and harassment" of JD:

> Our names are Norman G. and Bonnie G. Johnson parents of [JD] Johnson. It is imperative that you acknowledge this correspondence so that this bullying and harassment discontinue. On these dates you have pulled [JD] out of class 1/31/13, 2/1/13, 2/5/13, and 2/6/13 to discuss varsity basketball. After we told you that she is no longer a varsity basketball team player, due to her being targeted and harassed by Coach Tammy Millsaps. All of which knew [*sic*] or should have known about. Instead you refuse to acknowledge the phone conversations, the personal visits and written correspondence made. Instead you have taken [JD] out of class and demand that she play varsity basketball ignoring the fact that we told you she was not to play. [JD] is on the junior varsity team and earning the second sports credit that is required of her. We are fully aware that [JD] is being pursued to sit on the bench on the varsity team in order to complete the roster. That is something she nor we desire for her to do.
>
> Please consider this as a formal request to meet with all of the above immediately. We do not expect any retaliation (mistaken grades) being glared at and having to defend herself against 3 adults knowing full well she is unevenly matched.

(February 6, 2013 Email from Johnson and Bonnie to Perry.)

B. *The February 7, 2013 Meeting*

On Thursday February 7, Bonnie called Perry to request a meeting. Perry then called Johnson to say that Perry was "sick and tired of hearing of [Bonnie] requesting . . . meetings." (Johnson Dep. 32.) However, Perry yielded when Johnson said they were on their way to the school to see Perry. At the school, Johnson, Bonnie, and JD met with Perry and PTO president Millie Arcinegas.

Bonnie began by complaining of Perry's bullying of JD with his insistence that she remain on the varsity team and suit up despite her decision to leave the team because she never got to play. Perry responded by "sa[ying] that [tha]t was not bullying. Millie told him that yes, it was," to which Perry "shrugged his shoulders, like, Really?" (Johnson Dep. 35.) For most of the rest of the meeting, Perry repeatedly "talk[ed] over" the other participants, "divert[ed]" the conversation when asked questions, and "interrupt[ed]" Johnson repeatedly. (*Id*. at 39.) Finally, Johnson asked Perry to answer just one question:

> I asked him if it was true, if he made the following statement to my daughter: You better suit up; I don't want to hear no more about it. You will play.
>
> He looked me dead in my face and said, She's a liar and a manipulator.
>
> And he looked at Millie and he said, You know who to believe.
>
> . . . .
>
> I, in turn, slammed my hand and said, No, you are a liar and a manipulator, and you are full of crap.

(*Id*.; *see also id*. at 73 (Johnson told Perry "that he was full of shit").) Johnson testified that as he sat there after making that statement, Perry "jumped up" and went "crazy":

> I'm sitting down just like this. It was at a round table. He jumped up and started hollering at me and going crazy and whatnot, and he said that the meeting was over.
>
> Q. Were you sitting the whole time during the meeting?
>
> A. Yes, I was. He told me not to talk to him like that. I said, It was okay for you to talk to my daughter like that? . . . . It was all right for you to manipulate my daughter right in front of us?
>
> Q. So how were you feeling at that meeting? Were you mad, happy? What was going through your mind at that meeting?

A. I was like, I can't believe this. He made a statement, and that's probably why he blew . . . .

(Johnson Dep. 40.)

C. *Perry Bans Johnson from Capital Prep Events--On or Off Campus*

On the following Sunday, Johnson received an email from Perry stating that Johnson was "tres[pa]ssed from" Capital Prep:

This letter is to inform you that as of February 10, 2013, you are tres[pa]ssed from the Capital Preparatory Magnet School and its events, *(including but not limited to sports both on and off campus)*, with the exception of commencement exercises on May 31, 2013; after which the trespass will be reinstated. Disregarding this correspondence by coming to school grounds *or to an event in which Capital Prep is a participant*, will result in your immediate removal.

Your verbal altercations, physical intimidation and direct threats to staff have created an unsafe environment for staff, students and other parents and will no longer be tolerated.

A copy of this letter is being sent to the Hartford Board of Education and the Hartford Police Department as well as other communities and venues where the Capital Preparatory Magnet School's activities may occur.

(February 10, 2013 email from Perry to Johnson (the "Trespass Notice") (emphases added).)

The Trespass Notice did not bar Johnson from contacting school staff, nor did it bar him from attending school board meetings. After receiving the Trespass Notice, Johnson contacted several school board officials to attempt to contest it, without success--even though the Assistant Superintendent of Hartford Schools, Jonathan Swan, said his information was that no parent had ever before been banned from the school.

As a result of the ban, Johnson, when picking up his daughter by car after school, was not allowed to stop in front of the school but was required to wait down the street, even in an

9

emergency. He was not allowed to attend JD's final presentation, during her last semester, of her Senior Social Justice Project, on which she had worked hard for two years. (*See* Johnson's Answer to Perry Interrogatory No. 11.)

Johnson was also not allowed to attend the February 11 "senior night" celebration at Capital Prep, an event that honored students on the school's various teams. JD, no longer on the varsity team but still a member of the JV team, was relegated to the audience, rather than being honored. Johnson attempted to attend the event, but before doing so, he consulted the Hartford Police Department ("HPD"). He was informed that it had no knowledge of the Trespass Notice or any restraining order against him. HPD advised Johnson to go to Capital Prep and speak to a security guard. Johnson proceeded to do that, but, while he was speaking with the guard, Perry "c[a]me[] running out of the gym hollering, screaming, acting like a lunatic." (Johnson Dep. 49.) Johnson attempted to explain that HPD had told him to speak to the security guard, but Perry said "[t]hat ain't going to happen. I want him out of here. Get out." (*Id*.) Johnson left.

In March, the Capital Prep varsity girls basketball team--with JD no longer a member-- played in the state championship game, held at Mohegan Sun Casino. Johnson attempted to attend the game with his family. Before doing so, he spoke to Assistant School Superintendent Swan, who assured him that Perry could not bar him from attending. Nevertheless, after Johnson was seated, Fulton arrived and asked him to "just get up and leave," telling him that if he did not, Capital Prep officials would "have [him] taken out of here." (Johnson Dep. 55.) Johnson remained in place. Then, after one basketball game concluded, two Mohegan Sun staff members instructed Johnson to come with them, informing him that Perry "said that [Johnson] was a threat to the community" and had to leave. (*Id*. at 56.) Those men ushered Johnson out of the arena, into a corridor where there were

several additional security guards and a police officer with his hand on his gun, and took Johnson out of the stadium area.

D. *The Present Action*

In September 2013, Johnson brought the present action under 42 U.S.C. § 1983 in Connecticut state court. The complaint briefly described the above events and alleged that Perry's actions violated Johnson's First Amendment right of assembly, his Fourteenth Amendment rights to due process and equal protection, and his state-law right to be free from intentional infliction of emotional distress (or "IIED"). Perry removed the action to federal court and moved under Fed. R. Civ. P. 12(b)(6) to dismiss the complaint for failure to state a claim on which relief can be granted.

The district court granted the motion to dismiss the due process claim (*but see* Part II.A.1. below) and the equal protection claim. The court denied the motion to dismiss the First Amendment claim, concluding that the complaint plausibly alleged that Perry's actions in barring Johnson from school events were not reasonable and viewpoint neutral; and it denied the motion to dismiss the IIED claim, concluding that the complaint plausibly alleged facts from which a jury could find the elements of that state-law claim proven. *See Johnson v. Perry*, No. 3:13-cv-01531, 2014 WL 4794532 (D. Conn. Sept. 25, 2014) ("*Johnson I*"). Although the court dismissed the due process and equal protection claims with leave to amend, Johnson did not file an amended complaint.

Following completion of the pleadings and discovery, Perry moved for summary judgment dismissing Johnson's surviving First Amendment and IIED claims. To the extent pertinent to this appeal, Perry argued that he was entitled to summary judgment dismissing the First Amendment claim on the basis of his defense of qualified immunity. Perry filed a statement, pursuant

11

to D. Conn. Local Rule 56.1, of material facts as to which he contended there was no genuine issue to be tried (Perry's "Rule 56.1 Statement"), stating that Johnson at the February 7 meeting yelled at Perry and told him he was "full of shit" (Rule 56.1 Statement ¶ 17) and that Johnson had previously had "confront[ations]" with Millsaps and a parent (*id*. ¶¶ 18, 19), and quoting the text of Perry's Trespass Notice (*see id*. ¶¶ 22, 33). The Rule 56.1 Statement did not, however, contain a factual assertion that Johnson ever threatened anyone. Perry's inquiry at his deposition as to whom the Trespass Notice claimed he had threatened or intimidated (*see* Johnson Dep. 80) had gone unanswered (*see generally* Perry's Rule 56.1 Statement ¶ 32).

In *Johnson v. Perry*, 140 F.Supp.3d 222 (D. Conn. 2015) ("*Johnson II*"), the district court denied Perry's summary judgment motion, stating in part as follows:

> "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *De Jonge v. State of Oregon*, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937).

> A school is generally considered a nonpublic forum, as it is a property that is not traditionally open to the public for communication. . . . "[T]he government enjoys greater latitude in restricting speech in a nonpublic forum and may limit access or content based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Byrne v. Rutledge*, 623 F.3d 46, 54 (2d Cir. 2010). However, there is no categorical rule that the interests of a school in safety and order always outweigh constitutional rights. . . . While [i]t is clear a public school has a compelling interest in maintaining order and ensuring safety on its grounds . . . *restrictions on the First Amendment rights of parents and other members of the public . . . must be reasonable. . . .*

> Here, defendant argues that the ban was reasonable and viewpoint neutral because it was justified by defendant's concern that plaintiff posed a danger to the staff and children at the school. *However, whether plaintiff posed a danger to staff and children at the school is a disputed fact. Equally disputed is whether defendant banned plaintiff from school property based on a disagreement with the message plaintiff was conveying. That plaintiff's comments may have caused discomfort on the part of school staff, or may have been the subject of disagreement cannot justify governmental restriction or*

12

*suppression based on those comments. See Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.").

Defendant argues in the alternative that plaintiff has no First Amendment right to attend school events. Although the First Amendment does not guarantee unfettered access to school grounds, this argument cannot trump the requirement that restrictions on assembly and speech be reasonable and viewpoint neutral . . . .

*Johnson II*, 140 F.Supp.3d at 226-27 (other internal quotation marks omitted (emphases ours)).

The court concluded that if Johnson's version of the events were credited by the factfinder, his First Amendment right was sufficiently clearly established that Perry would not be entitled to qualified immunity:

*Viewed in the light most favorable to plaintiff*, a narrow view of the facts also establishes that plaintiff's rights were defined with reasonable specificity under existing law such that a reasonable official would have understood that his acts were unlawful.

*Indeed, plaintiff's First Amendment rights would be violated if defendant banned plaintiff from participation in his daughter's public school education merely because defendant disagreed with plaintiff's viewpoint or because of arbitrary bias*. . . . This is the story that plaintiff will tell. Defendant will contend that, in his opinion, plaintiff's intimidating behavior was so threatening that defendant's decision to implement such a ban was reasonable[ and] viewpoint neutral . . . . As genuinely disputed factual issues material to the qualified immunity defense exist, qualified immunity will be denied.

*Id*. at 230-31 (emphases added).

As discussed in greater detail in Part II.A.1. below, the district court, in addition to ruling on Perry's summary judgment motion, revisited and rescinded its prior dismissal of Johnson's

13

due process claim. The court *sua sponte* reinstated that claim, concluding that a cause of action was stated.

II. DISCUSSION

On appeal, Perry pursues his arguments, made in the district court, that he is entitled to summary judgment on the basis of qualified immunity with respect to Johnson's First Amendment claim. He contends (a) that banning Johnson from Capital Prep events did not violate Johnson's First Amendment right of assembly, or (b) that if it did, that right was not clearly established at the time the ban was imposed. In addition, he contends that excluding Johnson from school events without any hearing did not violate Johnson's liberty interest in directing his daughter's education and that a parent had no clearly established liberty interest in having access to school property.

For the reasons that follow, we conclude that Perry's challenges to the district court's decision to reinstate and entertain Johnson's due process claim are not properly before us. As to the challenges to Johnson's First Amendment claim, we conclude that Perry was not entitled to summary judgment for barring Johnson from attending Capital Prep events held beyond school property or attending sports contests on school property to which the public was invited, but was entitled to qualified immunity for banning Johnson from school property otherwise.

A. *The Issues Addressable on the Present Appeal*

The issues to be addressed in this appeal are cabined by three sets of principles: those governing (1) the required contents of the notice of appeal, (2) the required contents of the appellant's

brief, and (3) the applicability of the final judgment rule, *see* 28 U.S.C. § 1291, to denials of qualified-immunity-based motions for summary judgment.

1. *The Due Process Claim and Perry's Notice of Appeal*

The Federal Rules of Appellate Procedure ("FRAP Rules") provide that the appellant's "notice of appeal must . . . designate the judgment, order, or part thereof being appealed." Fed. R. App. P. 3(c)(1)(B). This "requirement for specificity in a notice of appeal refers to the relief granted or denied" by the district court, *Mt. McKinley Insurance Co. v. Corning Inc.*, 399 F.3d 436, 445 (2d Cir. 2005), and the contents of the notice of appeal define the scope of the appellate court's jurisdiction, *see*, *e.g.*, *Sheng v. M&TBank Corp.*, 848 F.3d 78, 88 (2d Cir. 2017) ("*Sheng*"); *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 134 (2d Cir. 2016) ("*Kovaco*"); *New Phone Co. v. City of New York*, 498 F.3d 127, 130 (2d Cir. 2007); *Kowsh v. Board of Elections*, 99 F.3d 78, 80 (2d Cir. 1996) ("*Kowsh*").

In *Kovaco*, the notice of appeal stated that the plaintiff appealed from an order granting summary judgment on his claims of discrimination under three statutes that were listed in the notice. We concluded that we did not have jurisdiction to review the dismissal of a claim the plaintiff had brought under a fourth, unmentioned, statute. *See* 834 F.3d at 134-35. In *Sheng*, which involved federal and state-law claims of disability discrimination, the district court, after the close of evidence at trial, had dismissed as a matter of law the claim brought under the New York State Human Rights Law ("NYSHRL"). After the jury found in favor of the defendant on the remaining claims, the plaintiff appealed, filing a notice of appeal stating that the appeal was taken "'from the *jury verdict* entered in th[e] action,'" 848 F.3d at 88 (emphasis in *Sheng*). We concluded that the appeal did not

15

encompass the court's dismissal of the NYSHRL claim. *See id*. In *Kowsh*, the notice of appeal stated that the plaintiffs appealed from "the Memorandum and Judgment" of the district court "reversing" the magistrate judge's "[r]ecommendation . . . that an injunction be issued placing Julio C. Ramirez on the ballot for the November 5, 1996 General Elections." 99 F.3d at 80 (internal quotation marks omitted). When the plaintiffs sought to argue on appeal not only that the injunction should have been granted, but also that the voter plaintiffs should be allowed to vote in a certain election district and that Ramirez's claim for damages should not have been dismissed, we concluded that "only so much of the district court's judgment as denied an injunction placing Ramirez's name on the ballot [wa]s properly before us." *Id*.

In the present case, as indicated in Part I.D. above, Johnson's complaint asserted four claims: violations of his First Amendment right of assembly, his Fourteenth Amendment right to due process, and his Fourteenth Amendment right to equal protection, and his state-law IIED claim. In 2014 in *Johnson I*, the district court, pursuant to Rule 12(b)(6), dismissed Johnson's equal protection and due process claims.

Perry subsequently moved for summary judgment, noting that since the equal protection and due process claims had been dismissed, his "motion for summary judgment is thus directed to the remaining counts of the complaint: Count One, which alleges First Amendment violations (peaceful assembly), and Count Four, which sounds in intentional infliction of emotional distress." (Defendant's Memorandum of Law in Support of Motion for Summary Judgment at 2 ("Perry's SJ Memorandum").) In 2015, the district court denied the summary judgment motion. *See Johnson II*, 140 F.Supp.3d at 226-28, 229-30.

16

In addition, the court reinstated Johnson's due process claim *sua sponte*:

> The Court dismissed plaintiff's due process claim without prejudice to amend his complaint to add allegations that attendance at school events is a right protected by law. Plaintiff declined to amend, but the Court now holds, *sua sponte*, that plaintiff's complaint, which alleges that defendant banned plaintiff from all school events, except commencement, implicated the fundamental right of a parent to make decisions concerning the care, custody, and control of his child.

*Id*. at 228; *see id*. at 229 ("Although the State has authority to restrict school access to ensure a safe and productive environment, it may not so significantly prohibit an individual parent from normal school access without affording the parent a fundamentally fair opportunity to contest the State's asserted reasons for doing so."). The court stated that "[t]he parties may submit a revised case management schedule within 14 days to allow for further discovery or additional dispositive motion practice on the due process count." *Id*. at 231.

Perry thereafter filed a timely notice of appeal that stated as follows:

> Notice is hereby given that Stephen D. Perry, the defendant in the above-named case, hereby appeals to the Court of Appeals for the Second Circuit from the Memorandum of Decision *denying defendant's motion for summary judgment* (Doc. No. 24) issued by Judge Warren W. Eginton entered in this action on the 21st day of October, 2015.

(Emphasis added.) As this notice neither stated that Perry wished to challenge all parts of the district court's order nor mentioned the court's revival and continuation of Johnson's due process claim *sua sponte*, but instead expressly referred to the denial of Perry's motion for summary judgment, we cannot infer that the notice encompassed any ruling by the district court other than that denying his summary judgment motion.

We note that Perry subsequently indicated as part of his "Form C" Pre-Argument documents in this Court that he would ask us to consider the due process claim. We would deem that

17

document to be a further, amended, notice of appeal if it had been filed within the 30 days allowed by Fed. R. App. P. 4(a)(1)(A) for the filing of a notice of appeal, *see generally Smith v. Barry*, 502 U.S. 244, 248-49 (1992) ("If a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal."). However, Perry's Form C was filed beyond the Rule 4 deadline. FRAP Rule 4 "establishes mandatory time limits for filing a notice of appeal," *Gonzalez v. Thaler*, 565 U.S. 134, 147 (2012), and "time limits for filing a notice of appeal have been treated as jurisdictional in American law for well over a century," *Bowles v. Russell*, 551 U.S. 205, 209 n.2 (2007).

We conclude that the district court's treatment of Johnson's due process claim is not within the scope of Perry's notice of appeal, and we thus lack jurisdiction to review that decision.

2. *The IIED Claim and Perry's Brief*

In contrast, Perry's notice of appeal does encompass the denial of his motion to dismiss Johnson's state-law claim for intentional infliction of emotional distress, since that was one of the two claims as to which Perry moved for summary judgment. However, the FRAP Rules provide that with respect to each issue on which appellate relief is sought, the appellant's brief on appeal must set out, *inter alia*, the appellant's contentions and his reasons, along with citations to the authorities and the parts of the record on which the appellant relies. *See* Fed. R. App. P. 28(a)(8).

In his brief on this appeal, Perry presents only arguments "with respect to the Constitutional claims" (Perry brief on appeal at 5), and none with respect to the IIED claim. Thus, even if the denial of Perry's motion for summary judgment dismissing the IIED claim--a motion not based on qualified immunity--were immediately appealable, any challenge to the district court's failure

18

to dismiss that claim has been abandoned, *see generally Otero v. Bridgeport Housing Authority*, 297 F.3d 142, 144 (2d Cir. 2002); *Day v. Morgenthau*, 909 F.2d 75, 76 (2d Cir. 1990); Fed. R. App. 28(a)(8).

### 3. *The First Amendment Claim and the Proper Scope of Review*

Ordinarily, the denial of a motion for summary judgment is not immediately appealable because such a decision is not a final judgment, *see* 28 U.S.C. § 1291. Under the collateral order doctrine, however, the denial of a qualified-immunity-based motion for summary judgment is immediately appealable to the extent that the merits of the defense can be decided as a matter of law, although not to the extent that the defense will depend on the resolution of questions of fact. *See, e.g., Behrens v. Pelletier*, 516 U.S. 299, 313 (1996); *Johnson v. Jones*, 515 U.S. 304, 313-18 (1995); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 38 (2d Cir. 2003) ("*O'Bert*"); *Martinez v. Simonetti*, 202 F.3d 625, 632 (2d Cir. 2000). "[W]here the district court has denied a qualified-immunity-based motion for summary judgment on the ground that there are triable issues as to which party's version of the facts is to be accepted, a defendant may pursue an immediate appeal if he adopts the plaintiff's version of the facts, contending that the facts asserted by the plaintiff 'entitle [the defendant] to the defense of qualified immunity as a matter of law.'" *O'Bert*, 331 F.3d at 38 (quoting *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996)).

As described in Part I.D. above, the district court in the present case found that Perry's entitlement to qualified immunity will depend on which version of the facts the jury accepts. Perry pursues this appeal on the premise that he is entitled to qualified immunity even on Johnson's view of the facts. It is only on that basis--*i.e.*, that Johnson's version of the facts is correct--that we have

19

jurisdiction over Perry's challenge to the denial of summary judgment on Johnson's First Amendment claim. We proceed on that basis. And, as usual, in reviewing the denial of summary judgment, we will resolve all ambiguities and draw all reasonable factual inferences in favor of the party against whom summary judgment was sought, *see*, *e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

B. *Qualified Immunity Principles*

The doctrine of "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012); *see*, *e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) ("*Rogoz*").

> [W]hen a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation.

*Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) ("*Tracy*"); *see*, *e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009). We are entitled to "'exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'" *Tracy*, 623 F.3d at 96 (quoting *Pearson*, 555 U.S. at 236).

The second prong of the standard means that officials are "entitled to qualified immunity [when] their decision was reasonable, even if mistaken," *Hunter v. Bryant*, 502 U.S. 224, 229 (1991), which "protect[s] 'all but the plainly incompetent or those who knowingly violate the

20

law,'" *id*. (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)). Against a background of clearly established law, the availability of qualified immunity "generally turns on the [defendant's conduct's] 'objective legal reasonableness.'" *Anderson v. Creighton*, 483 U.S. at 639 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).

Qualified immunity is an affirmative defense on which the defendant has the burden of proof, either at trial or on a motion for summary judgment. *See*, *e.g.*, *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Rogoz*, 796 F.3d at 247. Summary judgment on this basis is available if, with the facts taken in the light most favorable to the plaintiff, the alleged constitutional right either was not violated or was not clearly established at the time of the alleged violation. *See*, *e.g.*, *Anderson v. Creighton*, 483 U.S. at 639-40; *Rogoz*, 796 F.3d at 247; *Tracy*, 623 F.3d at 96.

The operation of the "clearly established" standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. at 639. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 640. However,

> [t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id*. Thus,

> [t]he unconstitutionality of outrageous conduct obviously will be unconstitutional, this being the reason, as Judge Posner has said, that "[t]he easiest cases don't even arise." *K.H. v. Morgan*, 914 F.2d 846, 851 (CA7 1990). But even as to action less than an outrage, officials can still be on notice that their conduct violates established law . . . in novel factual circumstances.

*Safford Unified School District No. 1 v. Redding*, 557 U.S. 364, 377-78 (2009) (other internal quotation marks omitted).

C. *First Amendment Principles*

The First Amendment prohibits the government from "abridging the freedom of speech, or of the press," and guarantees "the right of the people peaceably to assemble." U.S. Const. amend. I. "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937). "[O]f all constitutional rights, the freedoms of speech and of assembly are the most perishable, yet the most vital to the preservation of American democracy." *Wolff v. Selective Service Local Board No. 16*, 372 F.2d 817, 822 (2d Cir. 1967); *see*, *e.g.*, *Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable.").

"[G]overnment officials may stop or disperse public demonstrations or protests where '*clear and present danger* of riot, disorder, interference with traffic upon the public streets, or *other immediate threat to public safety, peace, or order*, appears.'" *Papineau v. Parmley*, 465 F.3d 46, 56-57 (2d Cir. 2006) ("*Papineau*") (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940) (emphases ours)). However, "*[f]ear* of serious injury cannot alone justify suppression of free speech and assembly. . . . To justify suppression of free speech there must be *reasonable ground to fear that serious evil will result if free speech is practiced*." *United States v. National Treasury Employees Union*, 513 U.S. 454, 475 (1995) (internal quotation marks omitted (emphases ours)). "The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be annoying to some people." *Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971) (internal quotation marks omitted).

Nonetheless, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 799-800 (1985). Where there is no clear and present danger, "speech restrictions imposed on [persons on] government-owned property are analyzed under a 'forum-based' approach that divides government property into three [principal] categories--the traditional public forum, the designated public forum, and the nonpublic forum," *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010), along with "a subset of the designated public forum," referred to as the "limited public forum," *id*. at 54 n.8 (internal quotation marks omitted); *see, e.g.*, *Peck ex rel. Peck v. Baldwinsville Central School District*, 426 F.3d 617, 625-26 (2d Cir. 2005) ("*Peck*"), *cert. denied*, 547 U.S. 1097 (2006); *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142-43 (2d Cir. 2004) ("*Make the Road*")). "[T]he level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs," *Peck*, 426 F.3d at 625, and the same analytical framework applies whether the First Amendment right being exercised is speech, as in *Peck*, or other "expressive activity" such as assembly, *see, e.g.*, *Travis v. Owego-Apalachin School District*, 927 F.2d 688, 692 (2d Cir. 1991) ("*Travis*").

Traditional public forums include areas such as "streets[ and] parks . . . 'which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly'"; as to a traditional public forum, the state may not enact "'[c]ontent-based restrictions'" unless "'they are necessary to serve a compelling state interest.'" *Peck*, 426 F.3d at 625-26 (quoting *Make the Road*, 378 F.3d at 142).

23

A "designated public forum" is a place that, although not traditionally open for public assembly and debate, "the government has taken affirmative steps to open for general public discourse." *Peck*, 426 F.3d at 626 (internal quotation marks omitted); *see*, *e.g.*, *Cornelius*, 473 U.S. at 802 ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse."). "Speech in a designated public forum is entitled to the same constitutional protection as that extended to expression in a traditional public forum, so long as the state continues to designate the forum for such use." *Peck*, 426 F.3d at 626. However, "the government may decide to close a designated public forum." *Make the Road*, 378 F.3d at 143.

A limited public forum is "created when the State opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Peck*, 426 F.3d at 626 (internal quotation marks omitted). In a limited public forum, regulations governing the content of speech are allowed, so long as they are "reasonable" and "viewpoint-neutral." *Id*.

A nonpublic forum is one that "is neither traditionally open to public expression nor designated for such expression by the State"; in such a forum, as in a limited public forum, content regulations are allowed if they are "reasonable and viewpoint-neutral." *Id*. (internal quotation marks omitted); *see*, *e.g.*, *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 392-93 (1993) ("'[C]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" (quoting *Cornelius*, 473 U.S. at 806)); *Travis*, 927 F.2d at 692 (government "may not suppress expression merely because it opposes the speaker's point of view").

24

D. *Johnson's Multi-Faceted First Amendment Claim*

Although Johnson's complaint alleges deprivation of his First Amendment right of peaceable assembly in a single cause of action, his claim has multiple aspects: Johnson complains that Perry barred him (1) from non-sports events (except May 31, 2013 commencement exercises) on school property, (2) from sports events on school property, and (3) from all school events beyond school property. Each aspect warrants particularized analysis.

1. *Access to School Property in General*

While it has long been established that parents have a liberty interest in directing their children's education without unreasonable interference by the states, *see*, *e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 518-19 (1925); *see also Wisconsin v. Yoder*, 406 U.S. 205, 232-33 (1972) (upholding parents' right, under the First Amendment's Free Exercise Clause, to decline to send children to school past eighth grade), precedents as to whether a parent has a First Amendment right of access to school property are scarce. If such a right exists--and we conclude that in some circumstances it does (*see* Part II.D.2. below)--it is not limitless.

> In the context of the "special characteristics of the school environment," . . . the government [has the power] to prohibit . . . . actions which "materially and substantially disrupt the work and discipline of the school." . . . . Associational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.

*Healy v. James*, 408 U.S. 169, 189 (1972) (quoting *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 513 (1969) (footnote omitted)).

> [N]o mandate in our Constitution leaves States and governmental units powerless to . . . *protect the public from the kind of boisterous and threatening conduct that disturbs the tranquility of* . . . . *buildings that require peace and*

25

*quiet to carry out their functions*, *such as* courts, libraries, *schools*, and hospitals.

*Carey v. Brown*, 447 U.S. 455, 470-71 (1980) (internal quotation marks omitted (emphases ours)). Thus, a school principal has "the authority . . . and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property" and that they do not engage in disruptive or "threatening conduct that disturbs the tranquility of schools." *Lovern v. Edwards*, 190 F.3d 648, 655 (4th Cir. 1999) ("*Lovern*").

Two appellate decisions, *Lovern* and *McCook v. Springer School District*, 44 F. App'x 896, 910-11 (10th Cir. 2002) ("*McCook*"), have, in various factual circumstances, concluded that a parent does not have a First Amendment right of unlimited access to public school property. In *Lovern*, the Fourth Circuit affirmed the dismissal of a First Amendment claim, asserted by a high school JV basketball player's non-custodial father, of the right to "boundless access to school property" on the ground that the claim was "plainly insubstantial and entirely frivolous," *Lovern*, 190 F.3d at 656. Lovern had begun by contacting the school's principal to insist that the school challenge, and refuse to comply with, official sanctions that had been imposed on the JV coach; when the principal declined, Lovern contacted the school superintendent's office, "where the handling of his complaints consumed a substantial amount of the employees' time," *id*. at 650. Thereafter, when his son was not selected for the varsity basketball team, Lovern complained of the decision by telephoning the varsity head coach at school and at his home, by calling the principal's office a number of times, and, at an evening basketball practice, by confronting the coaches for some 25 minutes. *See id*. As a result, the principal wrote Lovern a letter pointing out that the student's mother, his custodial parent, had requested notice and an opportunity to attend any school discussions about her children, and stating that any such discussions by Lovern must thus be scheduled in advance. The letter stated that Lovern

26

was barred from "High School property during school hours without [the principal's] express consent and authorization *except to attend scheduled activities open to the public*." *Id*. at 651 n.3 (internal quotation marks omitted (emphasis ours)).

After receiving this letter, Lovern "telephoned the principal, learned the name of the employee who drafted the letter, and then phoned her, both at her office and at her home, complaining about the letter's contents." *Lovern*, 190 F.3d at 651. The principal wrote Lovern again, explaining that the limitations stated in his prior letter were not meant to limit Lovern's access to information about his children's education but were intended to "maintain[] an orderly school atmosphere," *id*.

Lovern then proceeded for months to contact the school superintendent and other county school supervisory officials, and to attend county school board meetings, and accused school officials of various illegalities, corruption, and cover-ups. The school superintendent barred Lovern from all county school property or offices because of his "continued pattern of verbal abuse and threatening behavior towards school officials, including staff and School Board members." *Id*. at 652 n.7 (internal quotation marks omitted). Then, Lovern, a non-attorney who ran a private litigation corporation (and who "d[id] not dispute that his conduct towards school personnel was perceived as verbally abusive and threatening," *id*. at 656 n.13), sought, unsuccessfully, to have school board officials hire his company to assist in the investigation of his corruption allegations.

Following Lovern's commencement of suit alleging violation of his "constitutional rights of free speech, right of petition, and parental rights," *Lovern*, 190 F.3d at 653 (internal quotation marks omitted), and an evidentiary hearing on his request for a preliminary injunction to allow him access to school property, the district court had found that Lovern was completely lacking in candor and that he was "really trying to advance the interests of his company" rather than pursuing "concern

27

about the welfare of his children," *id*. at 653-54 n.9 (internal quotation marks omitted). The court of appeals affirmed the district court's dismissal of the case for lack of a substantial federal question.

In *McCook v. Springer School District*, 44 F. App'x 896, 910-11 (10th Cir. 2002), a somewhat more substantial constitutional claim was presented by parents who were more clearly attempting to pursue the educational interests of their son. The son had been given a five-day suspension from school, and from all school activities, for downloading on the school's computer material that contained obscenities and sexually explicit language. His father nonetheless brought him to the school the next day so that he could attend a pep rally. When the school superintendent saw them and asked them to leave, in light of the suspension, a physical confrontation ensued between the superintendent and the father. The altercation had ended by the time the police arrived.

The superintendent thereafter sent Mr. and Mrs. McCook ("the McCooks") a letter on the day their son's suspension had ended, informing them that it had ended, but stating that the son might face additional consequences in light of the altercation and that Mr. Cook was "not permitted on campus *at any time for any reason* until further notice." 44 F. App'x at 900 (internal quotation marks omitted (emphasis ours)). The McCooks sued, alleging, *inter alia*, deprivation of their First Amendment freedoms of association and assembly. The district court dismissed, without discussion, their complaints about being banned from all events on school property, "[p]resumably . . . because the McCooks presented no authority establishing a constitutional right to go onto school property," *id*. at 910. The Tenth Circuit affirmed without further discussion.

Johnson has not called to our attention any case in which a parent has been held to have a First Amendment right to unlimited access to school property. Given the responsibility of school officials to prevent "the kind of boisterous and threatening conduct" that would interrupt the "peace

28

and quiet" and "disturb[] the tranquility" required for the academic aspects of a school's functions, *Carey*, 447 U.S. at 470-71 (internal quotation marks omitted), we cannot conclude that a parent has a general and unlimited First Amendment right of access to school property. To the extent that Perry banned Johnson from Capital Prep property for purposes other than attendance at sporting events, we conclude that Perry should have been granted summary judgment on the basis of qualified immunity for that aspect of Johnson's First Amendment claim.

### 2. *Access to School Property for Sports Competitions*

To the extent that Johnson's First Amendment claim focuses on his exclusion from the audience at Capital Prep basketball games, however, it stands on a different footing, because for such games the school invites the attendance of members of the public. And although *Carey* included schools in its example of institutions for whose benefit speech and assembly restrictions may permissibly be imposed because their operations require tranquility--"courts, libraries, schools, and hospitals," 447 U.S. at 471 (internal quotation marks omitted)--courts, libraries, and hospitals, unlike schools, do not normally stage events at which the audience is encouraged not to be quiet but instead to engage in raucous and sustained noise. Peace, quiet, and tranquility are not characteristics of, or normally associated with, sports contests.

With respect to interschool basketball games, we think it clear that the Capital Prep gymnasium during such games was a limited public forum. (*See*, *e.g.*, Perry's Rule 56.1 Statement ¶ 18 (referring to Capital Prep "basketball games" played "in front of . . . parents, student[s], and spectators").) While the invitation to parents and other spectators to attend basketball games would not constitute an invitation to anyone to disrupt the game or intermissions with speeches about his or

29

her views on school policy generally, or political issues, or other subjects not related to the sporting event, persons attending the game are expected to engage in expressive activity, chanting and cheering for whichever team they favor. Indeed, they are encouraged to do so; many schools even have at the games groups of students whose function is to lead the audience in boisterous expressions of encouragement and partisanship.

As indicated in Part II.C. above, unless there is a clear and present danger of disruptions such as disorder, riot, obstruction of the event, or immediate threat to public safety, the school may regulate access to its gymnasium when it is being used as a limited public forum only if its restrictions are reasonable and viewpoint-neutral. The version of the events proffered by Johnson, with the record taken in the light most favorable to him, would permit a rational juror to find that Perry's ban of Johnson from Capital Prep basketball games was neither viewpoint-neutral nor reasonable. The jury could permissibly find that Perry had repeatedly bullied JD, that Perry had falsely denied bullying her and maligned her, and that Johnson had vehemently complained of the bullying and the falsehoods. The jury could further infer that Johnson presented no threat of disruption or of harm to anyone--nor even any specter of intimidation, his daughter having already withdrawn from the varsity team before imposition of the ban--and that Perry's motive in banning Johnson from the Capital Prep limited public forum was to punish him for having expressed his views that Perry had engaged in bullying and falsification.

*Lovern*, heavily relied on by Perry, is not to the contrary. Although the Fourth Circuit in *Lovern* concluded that the father's First Amendment claim to a right of "boundless access to school property" was wholly insubstantial, the ban there had been against his entering school property "during school hours," and it had expressly "except[ed]" from the ban his "attend[ance at] scheduled activities

30

open to the public." *Lovern*, 190 F.3d at 651 n.3 (internal quotation marks omitted).  In contrast, Perry recognizes that Johnson complains in part of being "barred . . . from public athletic events" (Perry's Rule 56.1 Statement ¶ 34 (internal quotation marks omitted)), and Perry's Trespass Notice emphasized that the ban against Johnson included "sports" events "both on and off campus."

We also conclude, in light of the authorities discussed in Part II.C. above, that the right not to be excluded, based on viewpoint differences or because of possible annoyance, from sports events to which the public was invited was clearly established.  Perry's motion for summary judgment was properly denied as to this aspect of Johnson's First Amendment claim.

3. *Access to Sporting Events Beyond School Property*

Finally, we can see no basis for Perry's claim of qualified immunity with respect to his ban against Johnson's attendance at school sports events held beyond school property.  First, the distinction between school regulations applicable on school property and those targeting events beyond school property is one that other Circuits, in assessing whether school authorities' restrictions violated First Amendment rights, had found important, and indeed dispositive.  In *Lovern*, for example, the Fourth Circuit, pointing out that the school officials "did not seek to affect Lovern's conduct except on [the county's school] property," 190 F.3d at 656, and instead left Lovern "free to speak and publicize his complaints about school officials' 'corruption,' so long as he was not on school property," *id*. at 656 n.13, noted that "'[t]he difference'" between regulating access to school property and regulating conduct beyond school property was "'decisive,'" *Lovern*, 190 F.3d at 655-56 (quoting *Bystrom v. Fridley High School*, 822 F.2d 747, 751 (8th Cir. 1987) ("*Bystrom*")).

31

*Bystrom* itself had dealt with the authority of high school officials to regulate or prohibit the distribution of written material, authored by students or others, on school property. The Eighth Circuit, in upholding most of the school's guidelines on that topic, stated,

> [w]e begin with a word about the legal context in which this case arises. *Only distribution "on school property*," J.A.3, *is at issue here. The school district asserts no authority* to govern or punish what students say, write, or publish to each other or to the public *at any location outside the school buildings and grounds. If school authorities were to claim such a power, quite different issues would be raised, and the burden of the authorities to justify their policy under the First Amendment would be much greater, perhaps even insurmountable. See*, *e.g.*, *Thomas v. Board of Educ., Granville Cent. School Dist.*, 607 F.2d 1043 (2d Cir. 1979), *cert. denied*, 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980).

*Bystrom*, 822 F.2d at 750 (emphases ours).

Second, the state championship basketball game from which Perry had Johnson removed was held not only off Capital Prep property but in a stadium at the Mohegan Sun casino, a venue that was privately owned. Persons attending sports events there are invitees of the owner. "First Amendment protections . . . are especially strong where an individual engages in speech activity from his or her own private property," *Papineau*, 465 F.3d at 56, or on private property on which the individual is an invitee.

In *Papineau*, accepting the plaintiffs' view of the events, which the defendants--like Perry here--adopted in order to make the denial of their qualified-immunity-based motion for summary judgment immediately appealable, we noted that the plaintiffs were "invitees" of the owner of the property on which they were arrested, *id*. at 54. The plaintiffs had "gathered on [that] private property to exercise their speech rights peaceably"; they "posed no 'clear and present danger' of immediate harm or violence"; they displayed no weapons; "they made no threats of physical harm to police or members of the public, [and] did not incite violence or disorder." *Id*. at 58. We held that, in those

circumstances, law enforcement officers who arrested the plaintiffs because of their demonstration of their views had no entitlement to qualified immunity.

Here, Johnson and his family bought tickets to the Capital Prep game at the Mohegan Sun. They were invitees lawfully on the premises. The school's Athletics Director Fulton came to their seats and asked Johnson to "get up and leave," telling him that if he did not, school officials would "have [him] taken out of [t]here." (Johnson Dep. 55.) When Johnson declined to leave voluntarily, Mohegan Sun staff members ushered him out of the stadium.

Contrary to the above principles, Perry has argued, in the district court and in this Court, that Johnson had no First Amendment right to attend the Capital Prep basketball game "held at the Mohegan Sun Casino" precisely because "[s]aid casino is a private establishment" (Perry's SJ Memorandum at 6; *see also* Perry reply brief on appeal at 12 n.5). But the only appellate decisions cited by Perry in support of that proposition, *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972), and *Hudgens v. NLRB*, 424 U.S. 507 (1976), are cases in which the plaintiff asserted First Amendment claims against the private property owners. Johnson's claim is against Perry, not against the Mohegan Sun. We need not decide whether *Papineau* clearly governs a situation in which a private actor removes a person merely on the advice of a government official rather than as, in effect, an agent of that official. Perry does not even attempt to distinguish *Papineau* on this basis. Instead, he argues only that the First Amendment did not protect Johnson from being banned from off-campus events. Here, a rational juror could conclude that the Mohegan Sun staff acted as Perry's agents. Indeed, the record indicates that the Mohegan Sun employees removed Johnson from its basketball arena only because they were instructed to do so by Perry. In removing Johnson from the stadium, they told him that Perry "said that [Johnson] was a threat to the community" (Johnson Dep. 56)--an accusation that

33

they clearly did not accept at face value, since they told Johnson that, although he "could not be in the arena," he "did not have to leave the casino" (*id*. at 57-58).

As discussed in Part II.D.2. above, on the present record, viewed in the light most favorable to Johnson, Perry had no basis for accusing Johnson of being a threat to the community, and the jury could infer that Perry's actions were neither viewpoint-neutral nor reasonable. On this record, Perry's causing Johnson's removal from the Mohegan Sun stadium violated Johnson's First Amendment rights, and there was no objectively reasonable basis for a school official to believe otherwise. We conclude that the district court correctly denied Perry's motion for summary judgment to the extent that Johnson's First Amendment claim is based on Perry's having him removed from the arena at the Mohegan Sun casino.

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and, except to the extent indicated above, have found them to be without merit. With respect to Perry's assertion of the qualified immunity defense to Johnson's First Amendment claim, we conclude (1) that Perry should have been granted summary judgment to the extent that he barred Johnson from entering school property for purposes other than attending sports contests, given the lack of an established First Amendment right of general access to school property; and (2) that the district court properly denied Perry summary judgment to the extent that he (a) barred Johnson from entering school property to attend spectator sports contests to which the public was invited, and (b) caused

34

Johnson's removal from a non-school, privately owned stadium at which Johnson was present as an invitee of the owner.

Accordingly, the order of the district court is, to the above extent, reversed in part and affirmed in part. The remainder of the appeal is dismissed for lack of appellate jurisdiction.