[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10256
_____

D.C. Docket No. 1:13-cv-00322-AT


TAMARA BRAND,
THEO BRAND,

Plaintiffs-Appellees,

versus

KEVIN CASAL,
TERESA PARDINAS,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(December 19, 2017)

Before MARTIN, JILL PRYOR, and MELLOY,[*] Circuit Judges.

_____

[*] Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

MARTIN, Circuit Judge:

Shortly before midnight on February 7, 2011, Gwinnett County Sheriff Deputies Kevin Casal and Teresa Pardinas went to the Snellville, Georgia home of Tamara Brand and Theotis Brand to execute an arrest warrant for their son, Wesley. By the time this encounter ended, Mrs. Brand and Deputy Casal had been in a physical altercation, and Deputy Pardinas had tased Mrs. Brand. The Brands sued Deputy Casal and Deputy Pardinas ("defendants") under 42 U.S.C. § 1983, alleging violations of the Fourth Amendment of the U.S. Constitution. The Brands also made claims under Georgia's Constitution that paralleled their federal claims. The deputies moved for summary judgment. They say the federal claims against them are barred by qualified immunity and the Georgia claims are barred by official immunity. The District Court granted the deputies immunity as to some claims, but not as to others. This is their appeal. After careful consideration, and with the benefit of oral argument, we affirm the ruling of the District Court in part, reverse in part, and remand for further proceedings.

# I.  BACKGROUND

A.  THE FACTS[1]

## 1.  Facts Leading to the Initial Encounter

In November 2010, a Magistrate Judge in Gwinnett County, Georgia issued an arrest warrant for Wesley Brand for felony theft by taking of a motor vehicle. Four months later, Deputy Sheriff Kevin Casal was assigned to serve that warrant. The warrant described Wesley as a 27-year-old white male,[2] and listed his address as "unknown."  Deputy Casal investigated and found an address for Wesley on a Gwinnett County jail booking sheet dated about three weeks before the warrant issued for him.  The booking sheet listed Wesley's address as 4179 Valley Brook Road, Snellville, Georgia.

Then on February 7, 2011, shortly after 11:00 p.m., Deputy Casal and his partner, Deputy Teresa Pardinas, arrived at 4179 Valley Brook Road to serve the warrant.  Deputy Pardinas immediately went around to the back of the house while Deputy Casal stayed at the front.  There was a car parked in the driveway, and

---

[1] Some of the facts recounted here are disputed by the parties.  In deciding claims of qualified immunity, we accept the plaintiffs' version of the facts.  See Lee v. Ferraro, 284 F.3d 1188, 1190, 1194 (11th Cir. 2002).  This account is therefore told in the light most favorable to the plaintiffs.

[2] Around the time of the incident, Wesley had begun to identify as a woman.  He has since changed his name and now lives as a woman.  Nevertheless, because almost all the evidence surrounding this event refers to Wesley as a man, we do as well.

Deputy Casal asked the dispatcher to run the license plate. It returned to Theotis Brand.

Deputy Casal walked up to the front porch of the house where a woman, Jayne Velazco, was smoking a cigarette.[3] He asked Ms. Velazco if Wesley Brand was there. Ms. Velazco responded that she "would get his mother and father." She went inside and shut the door. Ms. Velazco went upstairs to get the Brands, who were in their bedroom where Mrs. Brand was nursing their 7-month-old baby. The Brands then came downstairs to speak with the officer, Mr. Brand now holding the infant. Ms. Velazco followed the Brands downstairs and sat on the stairs in the foyer as Mrs. Brand opened the door to Deputy Casal.

### 2.  Initial Encounter at the Brands' Front Door

As soon as Mrs. Brand opened the front door, Deputy Casal put his foot inside the doorway so the door could not close. He told Mrs. Brand "he had a warrant for Wesley Brand, a 27-year-old white male." Mrs. Brand was "totally confused" by this because that description didn't match her son. Wesley was 17 (not 27); is mixed race (not white); and had begun to live as a woman (not male). So, to clarify things, Mrs. Brand asked if he wanted "Wesley Brand" or "a 27-year-old white male." Deputy Casal repeated that he wanted "Wesley Brand, [a] 27-

---

[3] Ms. Velazco is related to the Brands and lived with them.

year-old white male." He then asked if Wesley was home. Mrs. Brand said she didn't know and called out for Wesley.

Hearing this, Wesley came up from the basement and stepped outside onto the front porch where Deputy Casal was standing. Now Deputy Casal was confused too, because Wesley looked different from the booking photo in the warrant. Unlike in the photo, Wesley now "appeared as a female, with auburn dyed hair, a lacy black blouse, 'skinny jeans' and white stiletto 'cowgirl boots.'" Deputy Casal said to Mrs. Brand, "Ma'am, I need to come inside."

Mrs. Brand refused to let Deputy Casal come into the house. She told him he couldn't come in because he didn't have a search warrant and because Wesley was already outside waiting for Deputy Casal to arrest him. But Deputy Casal insisted the arrest warrant gave him the authority to enter the house. Wesley then went back inside. Deputy Casal continued asking Mrs. Brand to let him in, but she refused and stood blocking the doorway.

Deputy Casal responded by grabbing Mrs. Brand by the shirt, trying to pull her out of the doorway. She resisted and held onto the door frame. During the tussle, Mrs. Brand's shirt ripped and Deputy Casal was knocked off balance. The front part of Mrs. Brand's shirt ripped off, leaving her stomach, chest, and parts of her back exposed. According to Mrs. Brand, "not only could individuals see through [her] bra, but because of the tear, individuals could see [her] breasts."

### 3. Deputy Pardinas Joins In and Tases Mrs. Brand

At some point during these events, Deputy Pardinas radioed Deputy Casal, but he did not respond. Because he wasn't responding, she thought something must be wrong, so she walked around to the front of the house. Both Mrs. Brand and Wesley were in the foyer when Deputy Pardinas walked in through the front door. Mr. Brand was there as well, still holding the baby, and Ms. Velazco remained sitting on the stairs. Deputy Pardinas explained they had an arrest warrant, then turned to Wesley and confirmed that he was Wesley Brand, the subject of the warrant. Mrs. Brand was by now "extremely upset, agitated," and again told the officers to "get out of my house."

Mrs. Brand then turned to Ms. Velazco and asked for a phone so she could call 911. Ms. Velazco handed Mrs. Brand the home phone. Deputy Pardinas ordered Mrs. Brand to "drop the phone," but she did not. Instead she announced she was dialing 911. Mrs. Brand began dialing when suddenly and without warning, Deputy Pardinas tased her. The tase caused Mrs. Brand to fall to the floor in "[h]orrible, excruciating" pain.

Deputy Pardinas ordered Mrs. Brand to lie flat on her stomach. Deputy Pardinas began "punching [her] back," striking Mrs. Brand about three times in an attempt to get her to lie on her stomach. Mrs. Brand said she couldn't lie flat because she was pregnant. She kept one of her legs "elbowed out" to protect her

6

stomach.  Deputy Pardinas kicked Mrs. Brand's leg several times to get her into a fully prone position.

### 4.  The Protective Sweep and Other Developments

Soon after Mrs. Brand was tased, other officers who had been called to the scene began to arrive and file into the Brands' home.  There were eight or nine officers in total.  Deputy Casal was the "primary officer" that night and "directed [the officers] to certain places" in the Brands' home to conduct a "security sweep."  Deputy Casal "pointed" them "to go to different areas of the house and search the house."  According to Mr. Brand, the officers went through "pretty much everything" in "[a]ll the rooms in the house," even "going through drawers."  Deputy Casal and Deputy Pardinas personally searched only areas of the home that were adjacent to the foyer.

According to Mrs. Brand, after Deputy Pardinas removed the taser probes from her body, Deputy Pardinas "took no steps to rearrange" Mrs. Brand's shirt, which had been "ripped open" by Deputy Casal.  As a result, Mrs. Brand's "entire left breast" and "entire stomach" were exposed.  Mrs. Brand repeatedly asked the defendants for a shirt, and Mr. Brand even asked if he could give his wife his own shirt off his back.  The defendants refused.  The other group of officers also refused Mrs. Brand's requests that they cover her.  The officers laughed at her and told her to "[s]hut the fuck up."  As a result, Mrs. Brand was left exposed for the

entire time the eight or nine officers were in the Brands' home, which was approximately one hour. She remained exposed while the defendants took her and Wesley to jail for booking.

Mrs. Brand was charged with two Georgia criminal offenses. She was charged with obstructing a law enforcement officer (for allegedly swinging her arms at Deputy Casal when he tried to enter her home), and with cruelty to children in the third degree (for allegedly performing a "violent act" in front of her infant child). She stood trial on these charges, and the jury acquitted her of all.

B. PROCEDURAL HISTORY

In January 2013, the Brands filed the civil complaint against Deputy Casal and Deputy Pardinas that is the subject of this appeal. As set out above, they alleged violations of the Fourth Amendment and the parallel provision of the Georgia Constitution. See Ga. Const. Art. I, § I, Para. XIII. The deputies moved for summary judgment on the basis of qualified immunity (under federal law) and official immunity (under state law). The District Court denied them summary judgment on the Brands' claims for (1) unlawful entry; (2) excessive force; (3) unlawful protective sweep; and (4) bodily privacy. This is the deputies' timely appeal of those rulings.

## II. GOVERNING LAW

We review <u>de novo</u> a district court's ruling on summary judgment, including the district court's decision to grant or deny qualified immunity. <u>Lee</u>, 284 F.3d at 1190. The defense of qualified immunity "completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"[4] <u>Gonzalez v. Reno</u>, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002)).

In deciding whether an officer is entitled to qualified immunity, we conduct a two-part inquiry. First, we ask whether the defendant's "conduct violated a constitutional right." <u>Id.</u> at 1234 (quotation omitted). We make this decision based on "the <u>plaintiff's</u> version of the facts." <u>Lee</u>, 284 F.3d at 1194. Second, we ask whether the violation was "clearly established" at the time of the alleged misconduct.[5] <u>Gonzalez</u>, 325 F.3d at 1234 (quotation omitted). A right is clearly established if it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Saucier v. Katz</u>, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). The "salient question" is whether the state of the law at

---

[4] The Brands do not dispute that the deputies acted within their discretionary authority.

[5] We can begin with either prong of the qualified immunity analysis. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 236, 129 S. Ct. 808, 818 (2009).

the time of the alleged misconduct gave the defendants "fair warning" that their actions were unconstitutional.  Hope, 536 U.S. at 741, 122 S. Ct. at 2516.

"Georgia has an analogue to qualified immunity called 'official immunity.'" Smith v. LePage, 834 F.3d 1285, 1297 (11th Cir. 2016).  Under Georgia law, public officials are entitled to "official immunity" for their discretionary acts unless the plaintiff can show that the officer "act[ed] with actual malice or an intent to injure."  Cameron v. Lang, 549 S.E.2d 341, 344–45 (Ga. 2001). "'[A]ctual malice' requires a deliberate intention to do wrong," Merrow v. Hawkins, 467 S.E.2d 336, 337 (Ga. 1996), in other words, "a deliberate intention to do an unlawful act."  Adams v. Hazelwood, 520 S.E.2d 896, 898 (Ga. 1999).

### III.  DISCUSSION

## A.  UNLAWFUL ENTRY CLAIM

The Brands allege that Deputy Casal and Deputy Pardinas violated the Fourth Amendment when they entered the Brands' home with an arrest warrant for Wesley, but no search warrant for the home.  In considering qualified immunity for this claim, the District Court performed a separate analysis for the two deputies, and reached different results.  The court found Deputy Pardinas was entitled to qualified immunity but Deputy Casal was not.  Deputy Casal says this was error, and we have concluded he is right.  Deputy Casal, like Deputy Pardinas, is entitled

10

to qualified immunity for entering the Brands' home on the basis of the arrest warrant.

Even with no search warrant, an arrest warrant authorizes an officer to enter a person's home when a two-part test is met.  See Payton v. New York, 445 U.S. 573, 603, 100 S. Ct. 1371, 1388 (1980).  The officer must have "a reasonable belief [1] that the location to be searched is the suspect's dwelling, and [2] that the suspect is within the residence at the time of entry."  United States v. Magluta, 44 F.3d 1530, 1533, 1535 (11th Cir. 1995) (describing the "two-part inquiry" established in Payton).  Applying the Payton test to these facts, we conclude that Deputy Casal's entry was justified and therefore there was no constitutional violation.

Deputy Casal had a reasonable belief that Wesley Brand lived at 4179 Valley Brook Road.  To begin, the booking sheet from four months earlier listed 4179 Valley Brook Road as Wesley's address, and this supports a reasonable belief that Wesley lived there.  See United States v. Bervaldi, 226 F.3d 1256, 1265–67 (11th Cir. 2000) (applying Payton and finding officer's reliance on six-month-old address reasonable because "[r]esidency in a house . . . generally is not transitory or ephemeral, but instead endures for some length of time").  Deputy Casal also relied on his short encounter with Ms. Velazco on the Brands' front porch.  When Deputy Casal asked Ms. Velazco if Wesley was there, she said she "would get his

11

mother and father." A reasonable officer could infer from Ms. Velazco's response that Wesley lived at this location with his parents and that Ms. Velazco thought the officer should speak with Wesley's parents first.

For the District Court, the reasonableness of Deputy Casal's belief that Wesley lived at 4179 Valley Brook Road was undermined by the fact that the car parked in the driveway belonged to Theotis Brand, as opposed to Wesley Brand. According to the District Court, because the car "was registered to a different Brand," it was not reasonable to believe that Wesley lived there. We conclude to the contrary. Deputy Casal went to 4179 Valley Brook Road in the first place because it was the address Wesley gave for his jail booking sheet. Then, when Deputy Casal got to the address, he saw a car parked in the driveway and learned it was registered to someone with the same last name. It was reasonable to infer from this that Wesley lived with Theotis (the owner of the car)—especially after Ms. Velazco indicated that Wesley's parents lived there. Thus, we conclude Deputy Casal reasonably believed 4179 Valley Brook Road was Wesley's dwelling. See Magluta, 44 F.3d at 1535.

For the second prong of the Payton test, the facts also support a reasonable belief that Wesley was in the house at the time Deputy Casal entered. Deputy Casal came to the Brands' home after 11:00 p.m. in early February. Under this Court's precedent, "officers may presume that a person is at home at certain times

12

of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule." Id. at 1535. In Bervaldi, we applied this presumption when officers approached the suspect's house at 6:00 a.m. See 226 F.3d at 1267; see also United States v. Beck, 729 F.2d 1329, 1331–32 (11th Cir. 1984) (per curiam) (finding it "reasonable to believe that one would be at home at 7:30 a.m. and be sound asleep"). If "early morning raids" afford a presumption that the suspect is home, Magluta, 44 F.3d at 1538 n.17, we think it also reasonable for the officers to presume here that a person will be in their home at 11:00 p.m., especially on a cold February night. This record contains no evidence regarding Wesley's "known schedule" that would rebut this presumption. Id. at 1535. We thus conclude Deputy Casal was reasonable in his belief that Wesley was in the house at the time Deputy Casal went in.

Because Deputy Casal's entry based on the arrest warrant was permitted under Payton, it did not violate the Fourth Amendment. See Payton, 445 U.S. at 603, 100 S. Ct. at 1388. Deputy Casal is therefore entitled to qualified immunity on the Brands' unlawful entry claim and we reverse the District Court's decision to the contrary.[6]

---

[6] Because Deputy Casal's entry did not violate the Fourth Amendment, the parallel state-law claim also fails. See Wells v. State, 348 S.E.2d 681, 683 (Ga. Ct. App. 1986) ("[T]he protection against unreasonable searches provided in the Georgia Constitution is the same as that provided by the United States Constitution."). Since the state-law claim for Deputy Casal's entry must be dismissed on the merits, we do not address the defense of official immunity.

13

B.  EXCESSIVE FORCE CLAIM

The Brands also allege that Deputy Pardinas used excessive force in violation of the Fourth Amendment when she tased Mrs. Brand.  The District Court denied Deputy Pardinas qualified immunity on this claim.  We affirm that decision.

1.  Constitutional Violation

An officer's use of force is excessive under the Fourth Amendment if the use of force was "objectively [un]reasonable in light of the facts and circumstances confronting" the officer.  Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989) (quotation omitted).  The use of force is reasonable only if it was "necessary in the situation at hand."  Lee, 284 F.3d at 1197 (quotation omitted).  We evaluate whether force was constitutionally necessary by examining several factors, including: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396, 109 S. Ct. at 1872; see also Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002) ("To balance the necessity of the use of force used against the arrestee's constitutional rights, a court must evaluate [the Graham] factors.").

All the Graham factors point to the conclusion that Deputy Pardinas used excessive force when she tased Mrs. Brand.  The first factor calls on us to consider

14

the severity of the crime that caused the encounter to begin with.  Graham, 490

U.S. at 396, 109 S. Ct. at 1872.  As far as Deputy Pardinas knew, Mrs. Brand was

not suspected of any crime when the deputy deployed her taser.  Mrs. Brand was

not the subject of the arrest warrant.  And although Mrs. Brand was eventually

arrested by Deputy Casal for obstruction and cruelty to children in the third degree,

these alleged offenses were based on conduct that occurred before Deputy Pardinas

joined Deputy Casal at the front of the house.  Deputy Pardinas did not see, and did

not know about, the altercation between Mrs. Brand and Deputy Casal that led to

the charges against Mrs. Brand.[7]  Those charges do not therefore support the

reasonableness of Deputy Pardinas's use of force.  See Rodriguez v. Farrell, 280

F.3d 1341, 1352–53 (11th Cir. 2002) ("We do not use hindsight to judge the acts of

police officers; we look at what they knew . . . at the time of the act.").

Second, Mrs. Brand did not pose any "immediate threat to the safety of the

officers or others" when Deputy Pardinas tased her.  Graham, 490 U.S. at 396, 109

S. Ct. at 1872.  It is true Mrs. Brand was "extremely upset [and] agitated" that the

officers would not get out of her house.  But, under the Brands' version of

---

[7] Deputy Pardinas said she could see Deputy Casal "struggling" and "being pushed" in the doorway of the house as she came around to the front.  But Mr. Brand's testimony disputes this.  He said that because the front porch is elevated at a steep angle from the ground, Deputy Pardinas could not possibly have seen the struggle at the front door.  Again, "we are required to resolve all issues of material fact in favor of the plaintiff" and "approach the facts from the plaintiff's perspective," Lee, 284 F.3d at 1190, so we must assume for purposes of this appeal that Deputy Pardinas could not see the altercation.

events—which we accept at this stage—Mrs. Brand was never violent or aggressive toward the officers. For example, Ms. Velazco reports that Mrs. Brand never even yelled. Indeed, Ms. Velazco testified that "[t]he only aggressive acts came from the officers." Mrs. Brand was simply standing in her foyer, asking the officers to leave, holding a phone, and attempting to dial 911. The defendants point to the fact that Mrs. Brand disobeyed Deputy Pardinas's order to "drop the phone." But there was nothing dangerous about Mrs. Brand holding a phone in the first place, especially where she made clear she was using it only to dial 911. Her refusal to comply with the order to drop the phone did not pose any threat to the safety of the officers, and certainly was not a threat that would necessitate the use of a taser with no warning to Mrs. Brand. Cf. Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011) ("[R]esisting arrest without force does not connote a level of dangerousness that would justify a greater use of force.").

Third and finally, Mrs. Brand was neither actively resisting arrest nor attempting to escape when Deputy Pardinas tased her. Graham, 490 U.S. at 396, 109 S. Ct. at 1872. By all accounts, she had not even been told she was under arrest at the time she was tased.

Based on the Brands' account of the facts, we are persuaded that Deputy Pardinas "used force that was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate under Graham." Lee, 284 F.3d at 1198. We therefore

16

conclude that Deputy Pardinas's tasing of Mrs. Brand constituted excessive force in violation of Mrs. Brand's Fourth Amendment rights.

### 2. "Clearly Established" Law

Having concluded that Deputy Pardinas's conduct violated a constitutional right, the next question in our qualified immunity analysis is whether that constitutional right was "clearly established" at the time. Gonzalez, 325 F.3d at 1234 (quotation omitted). We conclude that it was.

In Fils, this Court considered whether an officer was entitled to qualified immunity for tasing a man who (1) was suspected of only a minor crime (disorderly conduct); (2) "clearly did not present a threat to [the officer's] safety, or to the safety of anyone else"; and (3) "was not resisting arrest or attempting to escape." 647 F.3d at 1288–90. In affirming the denial of qualified immunity, we held that our prior precedent in Priester v. City of Riviera Beach, Florida, 208 F.3d 919 (11th Cir. 2000),[8] and Vinyard, 311 F.3d 1340,[9] "clearly establish that such force is excessive where the suspect is non-violent and has not resisted arrest." Fils, 647 F.3d at 1292.

---

[8] In Priester, the police officer set his attack dog on the plaintiff even though the plaintiff had submitted to the officer's commands and was lying flat on the ground. 208 F.3d at 927.

[9] In Vinyard, the police officer pepper sprayed the eyes of a non-violent plaintiff who was handcuffed safely in the back seat of the officer's squad car and did not pose a threat to the officer. 311 F.3d at 1347–48.

Just like the officer in <u>Fils</u>, Deputy Pardinas tased Mrs. Brand even though she was not violent or aggressive and was not resisting arrest.  So in the same way we did in <u>Fils</u>, we again recognize that our law was clearly established that the use of a taser under such circumstances was excessive force.[10]  The District Court therefore properly denied Deputy Pardinas qualified immunity on the Brands' excessive force claim.

### 3.  Parallel State-law Claim

We also affirm the District Court's denial of official immunity to Deputy Pardinas for the Brands' state-law excessive force claim.  As mentioned earlier, in order to overcome official immunity, the plaintiff must show the officer "act[ed] with actual malice or an intent to injure."  <u>Cameron</u>, 549 S.E.2d at 344–45.  A reasonable jury could find that Deputy Pardinas acted with actual malice or intent to injure because she used extreme physical force against Mrs. Brand even though the facts, when viewed most favorably to the plaintiffs, show Mrs. Brand posed no threat whatsoever.  See <u>Kidd v. Coates</u>, 518 S.E.2d 124, 125 (Ga. 1999) ("[I]f [officers] shot [the suspect] intentionally and without justification, then they acted

---

[10] For qualified immunity purposes, the law that clearly establishes a violation "must be . . . in effect at the time of the alleged violation."  <u>McClish v. Nugent</u>, 483 F.3d 1231, 1237 (11th Cir. 2007).  Although <u>Fils</u> was decided five months after the events of this case, <u>Fils</u> held that the use of a taser against a non-violent person who has not resisted arrest was clearly established under our circuit's law at least as far back as 2003 (when the events of <u>Fils</u> happened).  See 647 F.3d at 1276.  As a result, under <u>Fils</u>, Deputy Pardinas's violation in 2011 was also clearly established.

18

solely with the tortious actual intent to cause injury." (quotation omitted)).
Because a genuine dispute of material fact exists about whether Deputy Pardinas
acted with actual malice or intent to injure, she is not entitled to official immunity.
Id.

C.  CLAIM OF UNLAWFUL PROTECTIVE SWEEP

The Brands next claim the protective sweep conducted of their home after
Mrs. Brand was tased violated their Fourth Amendment rights.  They seek to hold
Deputy Casal liable for this violation.  The District Court denied Deputy Casal
qualified immunity on this claim.  After careful review, we reverse the District
Court on this claim.

In Maryland v. Buie, 494 U.S. 325, 110 S. Ct. 1093 (1990), the Supreme
Court held that officers are permitted, in the context of a valid arrest, to conduct a
"protective sweep" of a residence for the purpose of ensuring the officers' safety.
Id. at 333–35, 110 S. Ct. at 1097–99.  The "protective sweep" is justified if the
"officer possessed a reasonable belief based on specific and articulable facts . . .
that the area swept harbored an individual posing a danger to the officer or others."
Id. at 327, 110 S. Ct. at 1095 (quotation and citation omitted and alteration
adopted); see also United States v. Tobin, 923 F.2d 1506, 1513 (11th Cir. 1991)
(en banc) (finding a protective sweep justified following a drug-related arrest
where multiple vehicles were present at a house and occupants had lied about the

19

number of people present, thus "[giving] rise to a reasonable belief that someone else could be hiding in the house"); United States v. Caraballo, 595 F.3d 1214, 1225 (11th Cir. 2010) (approving a post-arrest sweep based on "inconsistent" answers from suspects who "appeared extremely nervous").

Ms. Velazco's presence at the Brands' home, as well as radio reports from Deputy Pardinas identifying a man near the rear of the house,[11] justifiably gave Deputy Casal reason to believe there might be another person somewhere in the house. There was also reason to believe that any other people in the house could have presented a danger to the officers present. A violent encounter had just transpired between Mrs. Brand and Deputy Pardinas—regardless of who was responsible for that confrontation.[12] In this environment of heightened tension, it is not unreasonable for an officer to believe that others in the house might seek further confrontation. The split-level layout of the home prevented Deputy Casal from being able to see all the adjacent spaces where another person might be hiding. See Buie, 494 U.S. at 333, 110 S. Ct. at 1098 ("An ambush in a confined

---

[11] Deputy Pardinas had radioed Deputy Casal from the backyard reporting that she saw a man at the rear of the house matching Wesley's description. Because Wesley did not match the description the deputies possessed before arriving at the house, it was reasonable for Deputy Casal to suspect Deputy Pardinas had seen a different person out of view of the front entryway.

[12] The Court must analyze the protective-sweep claim separately from the excessive-force claim. See County of Los Angeles v. Mendez, 581 U.S. __, 137 S. Ct. 1539, 1547 (2017) (rejecting an analysis in the Fourth Amendment context that would "instruct[] courts to look back in time to see if there was a different Fourth Amendment violation that is somehow tied to the [later Fourth Amendment violation]").

20

setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."). For these reason, a brief protective sweep of the house was justified.

This does not end the Fourth Amendment inquiry: we must still decide whether the sweep exceeded the constitutionally allowable scope. A protective sweep "may extend only to a cursory inspection of those spaces where a person may be found," and can extend "no more than necessary to protect the officer[s] from harm." Id. at 333, 335, 110 S. Ct. at 1098, 1099.

Deputy Casal personally searched only areas of the home that were adjacent to the foyer. There are no allegations that this portion of the protective sweep was in any way excessive. Therefore his actions did not violate the Fourth Amendment.

The Brands do allege that other officers searched "pretty much everything" in the home, including "going through drawers." They seek to hold Deputy Casal liable for the actions of those other officers. Searching through drawers plainly goes beyond what is allowed for a protective sweep. See id. As a supervising official, Deputy Casal can be held liable for that violation only if "there is a causal connection between [his actions] . . . and the alleged constitutional deprivation." Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 802 (11th Cir. 1998) (quotation omitted). "A causal connection can [] be established by facts which

21

support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Gonzalez, 325 F.3d at 1235. Because the initial protective sweep was not unconstitutional, in order to impose liability on Deputy Casal the Brands would need to establish a causal link between Deputy Casal and the unlawful portions of the sweep.

The record establishes that Deputy Casal was the "primary officer" at the Brands' home and, and he "directed [officers] to certain places" in the home and told them "[t]o search." Specifically, when the other officers arrived at the Brands' home, it was Deputy Casal who "pointed" them "to go to different areas of the house and search the house." Yet the record does not show that Deputy Casal directed (or even knew of) the actions taken by the other officers in carrying out the sweep. Thus there is no direct causal connection between Deputy Casal's actions and any officer's decision to search through drawers or otherwise exceed the proper scope of a protective sweep. Deputy Casal cannot therefore be liable for the claim that the protective sweep exceeded its proper scope.[13]

---

[13] Because Deputy Casal is not liable under the Fourth Amendment for an improper protective sweep, the parallel state-law claim fails on the merits, and there is no need to address the defense of official immunity. See Wells, 348 S.E.2d at 683.

D.  BODILY PRIVACY CLAIM

Finally, the Brands allege that Deputy Casal and Deputy Pardinas violated Mrs. Brand's Fourth Amendment rights by refusing to cover her exposed breasts and by forcing her to continue to expose herself as she lay handcuffed in her foyer and as she was taken to jail.  The District Court denied the defendants qualified immunity on this claim.  We affirm that decision.

1.  Constitutional Violation

A "seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."  Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005); see also United States v. Place, 462 U.S. 696, 707–08, 103 S. Ct. 2637, 2645 (1983) ("[T]he manner in which the seizure was conducted is, of course, as vital a part of the inquiry as whether it was warranted at all." (quotation omitted and alterations adopted)).  The seizure of a person can be rendered unconstitutional when officers unreasonably infringe on the person's "right to bodily privacy." Fortner v. Thomas, 983 F.2d 1024, 1026 (11th Cir. 1993); see, e.g., May v. City of Nahunta, 846 F.3d 1320, 1331 (11th Cir. 2017) (holding that "the manner in which [the officer] conducted the seizure violated [the plaintiff's] Fourth Amendment right" where the officer "lock[ed] himself in a room with [the plaintiff] in a state of undress").  As this Court has said, "people have a protected privacy interest in

23

avoiding . . . exposure of their naked bodies." Padgett v. Donald, 401 F.3d 1273, 1281 (11th Cir. 2005).

The Brands argue that the defendants violated this right to bodily privacy by refusing to cover Mrs. Brand's exposed breasts. Specifically, Mrs. Brand said people "could [] see through [her] bra" and "could see both [her] breasts." Ms. Velazco testified that Mrs. Brand's "breast was exposed," and Wesley testified that her "left breast was out, totally out." Despite the Brands repeated requests that the defendants allow Mrs. Brand to have a replacement shirt or something else to cover herself, the defendants refused. Viewing this record in the light most favorable to the plaintiffs, it shows that because the defendants did not let Mrs. Brand cover herself, at least one of her breasts was exposed to all the officers who came into the Brands' home that night and to anyone else who may have seen Mrs. Brand as she was taken from her home to the jail for booking. On these facts, we hold that the defendants' refusal to cover Mrs. Brand violated her Fourth Amendment rights.

In Los Angeles Cty. v. Rettele, 550 U.S. 609, 127 S. Ct. 1989 (2007) (per curiam), the Supreme Court set out the standard for deciding whether an officer violates the Fourth Amendment when he forces a suspect to expose herself during the course of an otherwise lawful search or seizure. In Rettele, officers entered the plaintiffs' home with a valid search warrant, ordered the plaintiffs—who were

naked—out of bed, and did not allow them to "retrieve clothing or to cover themselves with the sheets."  550 U.S. at 611, 615, 127 S. Ct. at 1991, 1993.  After two minutes, the officers allowed the plaintiffs to dress.  Id.  The Court held that, on those facts, the Fourth Amendment was not violated.  Id. at 616, 127 S. Ct. at 1994.  However, the Court explained that the officers' conduct did not violate the Fourth Amendment because:

> [T]here is no allegation that the deputies prevented Sadler and Rettele from dressing longer than necessary to protect their safety.  Sadler was unclothed for no more than two minutes, and Rettele for only slightly more time than that.  Sadler testified that once the police were satisfied that no immediate threat was presented, "they wanted us to get dressed and they were pressing us really fast to hurry up and get some clothes on."

Id. at 615, 127 S. Ct. at 1993 (emphasis added).  The Supreme Court recognized the plaintiffs' Fourth Amendment interest in avoiding the "frustration, embarrassment, and humiliation" of having officers enter their home while they were "engaged in private activity" and then forcing them to stand nude.  Id. at 615–16, 127 S. Ct. at 1993.  But on the record in Rettele, the Court concluded that the officers were "act[ing] in a reasonable manner to protect themselves from harm, [so] the Fourth Amendment is not violated."  Id. at 616, 127 S. Ct. at 1993–94.

Nevertheless, Rettele establishes that police officers violate the Fourth Amendment when they force an arrestee to expose herself "longer than necessary to protect their safety" or effectuate some other legitimate purpose.  Id. at 615, 127

25

S. Ct. at 1993.  Deputy Casal and Deputy Pardinas refused to let Mrs. Brand or one of her family members cover her exposed breast during the entire time they were in the house—about one hour.  Then they forced her to remain exposed while they took her to the jail for booking.  The defendants have pointed to no explanation about why they couldn't give Mrs. Brand a new shirt, or let Mr. Brand or Ms. Velazco get her one as they asked to be allowed to do.  Unlike Rettele, where the involuntary nudity was constitutional because it was brief and lasted no longer than necessary to protect the officers' safety, Mrs. Brand's involuntary exposure continued for longer than necessary, with no good law-enforcement purpose.  The defendants' infringement on Mrs. Brand's bodily privacy therefore rendered their seizure of Mrs. Brand unreasonable under the Fourth Amendment.  See May, 846 F.3d at 1331 (concluding that officer's "patent disregard for [the plaintiff's] personal dignity" over a "prolonged duration" was sufficient to violate the Fourth Amendment because "it was clearly inappropriate for a male officer to lock himself in a room with a woman in a state of undress under the circumstances, particularly after she asked him to leave"); Shroff v. Spellman, 604 F.3d 1179, 1191 (10th Cir. 2010) ("Because [the officer] failed to present any justification for requiring [the plaintiff] to expose her breasts in the presence of another person, we conclude that [the officer] violated [the plaintiff's] Fourth Amendment right to personal privacy . . . ."); Mitchell v. Stewart, 608 F. App'x 730, 733–34 (11th Cir.

26

2015) (concluding that, where officers "transported [plaintiffs] to jail with their genitalia exposed," a "reasonable jury could find [plaintiffs'] Fourth Amendment rights were violated").

### 2.  "Clearly Established" Law

Having determined that the defendants' conduct violated a constitutional right, we must address whether that right was "clearly established" at the time of the violation.  Gonzalez, 325 F.3d at 1234.  We conclude that it was.

Rettele gave law enforcement officers fair warning that they cannot force an arrestee to expose her intimate body parts "longer than necessary to protect their safety."  550 U.S. at 615, 127 S. Ct. at 1993.  This is exactly what these deputies did to Mrs. Brand.  In light of Rettele's statement that involuntary exposure becomes unreasonable "once the police [are] satisfied that no immediate threat [is] presented," id., a reasonable officer in the defendants' position would have known that forcing Mrs. Brand to expose her breasts for over an hour, when it was entirely unnecessary to protect the officers' safety, violated the Fourth Amendment.[14]

---

[14] Although the Supreme Court found the officers' actions in Rettele did not constitute a Fourth Amendment violation, a case can clearly establish a constitutional violation without itself presenting one, so long as the reasoning is sufficient to put officers on notice of what would constitute a violation.  See Hope, 536 U.S. at 743, 122 S. Ct. at 2517 (explaining that because the case clearly "cautioned" officers about the circumstances in which "a constitutional violation might have been present" and the "point of severity" at which a violation "would . . . have occurred," the case "gave fair warning to [the defendants] that their conduct crossed the line of what is constitutionally permissible").

The defendants argue the violation was not clearly established because at the time of the violation, all the relevant Fourth Amendment caselaw involved the exposure of genitals (or genitals and breasts), but not breasts alone.  So, they say, only "genital exposure" implicated the right to bodily privacy.  We reject this distinction.  Although Rettele and the other bodily-privacy cases addressed people whose exposure included genitalia, the cases give no indication that the distinction between a person's genitals and a woman's breasts is of constitutional significance.  See Doe v. Luzerne Cty., 660 F.3d 169, 176 (3d Cir. 2011) ("[W]e are not aware of any court of appeals that has adopted [] a requirement that certain anatomical areas of one's body, such as genitalia, must have been exposed for that person to maintain a privacy claim . . . .").[15]  Rather, the decisions explain that the protected Fourth Amendment interest is in avoiding the "embarrassment" and "humiliation" of having one's intimate body parts exposed, whatever those intimate parts may be.  Rettele, 550 U.S. at 615–16, 127 S. Ct. at 1993–94; see also Fortner, 983 F.2d at 1030 (recognizing "a prisoner's constitutional right to bodily privacy" and explaining that "involuntary exposure of" a person's genitals "may be especially

---

[15] Although the Third Circuit "locate[s] this right [to bodily privacy] within the Fourteenth Amendment," it explained that "the contours of the right appear to be the same" as the right to bodily privacy that other circuits have "locate[d] . . . in the Fourth Amendment." Doe, 660 F.3d at 176 n.5; see also Brannum v. Overton Cty. Sch. Bd., 516 F.3d 489, 494 (6th Cir. 2008) (explaining that "the same privacy right" that "some circuits have found . . . located in the Due Process Clause" of the Fourteenth Amendment also "derives from the Fourth Amendment").

demeaning and humiliating" (quotation omitted and emphasis added)); Doe, 660

F.3d at 176–77 (refusing "to draw bright lines based on anatomical parts or

regions"). As this Court said in Padgett, a person's "right[] to bodily privacy may

be violated by allowing [] correctional officers to view them in states of nudity."

401 F.3d at 1281 (emphasis added). This language clearly encompasses more than

just a person's genitals. See also Boxer X v. Harris, 437 F.3d 1107, 1111 (11th

Cir. 2006) (explaining that the right to bodily privacy protects against "the harm of

compelled nudity"). Given these explanations and articulations of the right to

bodily privacy, no reasonable officer would have concluded that the constitutional

principle of Rettele turned on whether the couple in that case was forced to show

their genitals rather than only the woman's breasts. See Hope, 536 U.S. at 742,

122 S. Ct. at 2517 (warning against the "danger of a rigid, overreliance on factual

similarity" when conducting the clearly-established inquiry). Forcing a woman to

expose either body part against her will is a "degrading and humiliating method[]"

of conducting a seizure, which the Fourth Amendment protects against. May, 846

F.3d at 1332.

"In a civilized society, one's anatomy is draped with constitutional

protections." United States v. Afanador, 567 F.2d 1325, 1331 (5th Cir. 1978).[16] A

---

[16] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

29

reasonable officer would have known that subjecting Mrs. Brand to the indignity of exposing herself to countless strangers for an extended period of time—for no legitimate law-enforcement purpose—violated those constitutional protections. We conclude, therefore, that the defendants' violation of Mrs. Brand's right to bodily privacy was clearly established.  We affirm the District Court's denial of qualified immunity on the Brands' bodily-privacy claim.[17]

## IV.  CONCLUSION

We affirm the District Court's denial of summary judgment on the Brands' federal claims for excessive force (against Deputy Pardinas) and bodily privacy (against both defendants).  We also affirm the denial of summary judgment on the state-law claim for excessive force (against Deputy Pardinas).  We reverse the denial of summary judgment on the Brands' federal and state-law claims for unlawful entry (against Deputy Casal) and unlawful protective sweep (against Deputy Casal).  We remand for proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[17] We do not address official immunity for the bodily-privacy claim because the Brands did not allege that claim under state law.