*Frierson v. Reinisch*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 26th day of March, two thousand twenty.

PRESENT:
> RICHARD C. WESLEY,
> SUSAN L. CARNEY,
> STEVEN J. MENASHI,
> > *Circuit Judges.*

_____

TRUMAN FRIERSON,

> *Plaintiff-Appellee,*

> > v.                                    No. 19-1740

PAUL REINISCH, DIRECTOR OF PHYSICAL EDUCATION, HEALTH AND ATHLETICS, JOHN CARMELLO, SUPERINTENDENT,

> *Defendants-Appellants,*

TROY CITY SCHOOL DISTRICT, PAUL BEARUP, TROY CITY SCHOOL DISTRICT BOARD OF EDUCATION, KATHY AHERN, SCHOOL ATTORNEY, JOE MARIANO, PRINCIPAL,

> *Defendants.*[*]

_____

[*] The Clerk of Court is directed to amend the caption to conform to the above.

FOR PLAINTIFF-APPELLEE:          MICHAEL H. SUSSMAN, Sussman & Associates, Goshen, NY.

FOR DEFENDANTS-APPELLANTS:    GREGG T. JOHNSON, Johnson & Laws, LLC, Clifton Park, NY.

Appeal from an order of the United States District Court for the Northern District of New York (D'Agostino, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment entered on June 5, 2019, is **AFFIRMED**.

Defendants-Appellants Paul Reinisch[1] and John Carmello (together, "Defendants") appeal from an interlocutory order of the United States District Court for the Northern District of New York (D'Agostino, *J.*), denying their motion for summary judgment, which they based on qualified immunity. We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision to affirm.

The following statement of facts is drawn from the evidence as viewed in the light most favorable to Frierson: on an interlocutory appeal from the denial of qualified immunity at summary judgment, we must accept a plaintiff's version of the facts. *See Tooly v. Schwaller*, 919 F.3d 165, 172 (2d Cir. 2019).

Frierson's daughter, Shalie, played varsity basketball for Troy High School during the 2016-17 school year, as she had in several prior years. In December 2016, the parents of several of Shalie's teammates began to contact Frierson, sharing with him their complaints about the conduct of the girls' basketball coach, Paul Bearup ("Coach Bearup"). They asked

---

[1] In the case caption that Defendants used in their Notice of Appeal, they spell this Defendant's name "Reinish." Both the District Court in its orders and the parties in their appellate briefs, however, refer to this Defendant as "Reinisch." We therefore adopt the latter spelling and direct the Clerk to amend the caption accordingly.

Frierson to arrange a meeting with school administrators to discuss their concerns, including concerns about Coach Bearup's "brusque and abusive demeanor" towards the players. App'x 995.

Frierson, who harbored similar unhappiness about Coach Bearup's treatment of Shalie, agreed to advocate on behalf of the parents. Towards that end, on January 5, 2017, he met first with Joe Mariano, the principal of Troy High School, and then with John Carmello, the Superintendent for the Troy City School District, to discuss the parents' grievances. Not satisfied by the outcome of either meeting, Frierson and several other parents then gathered on January 6 to brainstorm "other means of making known [their] serious distress with the coach," including, *inter alia*, initiating a "student walk-out at an upcoming game." App'x 998. The group did not settle on a course of action, however, choosing instead to wait and see "how the administration [would] respond to [their] concerns." App'x 998.

On the evening of January 9, 2017, Frierson drove to Troy High School to pick up his daughter from basketball practice. After entering the gymnasium through a side door, "as [he] had done many times [before]" (he later averred), Frierson was approached by several of Shalie's teammates, who started to express their discontent with Coach Bearup. App'x 998–99. To hear them out, Frierson walked with the players into the Troy High School cafeteria, where he proceeded to update them on the parents' efforts to resolve these issues with school officials. During this conversation, Frierson mentioned to the students the possibility of organizing a student "walk-out." App'x 999. Frierson did not, however, "encourage" the players to boycott any of the team's upcoming games, urging them instead to "speak with their own parents" about how best to address the situation. App'x 999.

The next day, Reinisch, then the Athletic Director for the Troy City School District, heard that a parent had met with several varsity basketball players in the school's cafeteria and asked them to walk off the court during the next game, which was scheduled to take place that evening (January 10). Director Reinisch proceeded to investigate what he later described as a "rumor." App'x 104. First, he spoke with a parent of one of the players who confirmed his understanding that, during the impromptu meeting in the cafeteria, Frierson had encouraged the students to protest Coach Bearup's behavior by walking out of the

3

January 10 basketball game. Director Reinisch then watched footage of the gathering recorded by a surveillance camera located in the school cafeteria. Although the video recorded only images and not sound, it indeed showed Frierson meeting with a group of basketball players on the evening of January 9.

The January 10 basketball game took place without incident: none of the players protested or walked off the court. Then, on January 13, Director Reinisch informed Frierson by phone that he had banned Frierson from attending future Troy High School athletic events. In a letter dated the same day, Director Reinisch accused Frierson of (1) holding "a meeting with students on school property" without the knowledge or permission of school authorities, and (2) "attempt[ing] to organize a protest against [the school's] coaching staff, encouraging multiple players to walk off the court." App'x 169. "In light of these events," Director Reinisch announced, Frierson could "no longer . . . attend any Troy athletic events until further notice." The ban covered both "home and away games." *Id.*

Frierson then filed this action against Defendants-Appellants (and others), alleging that the ban violated, among other rights, his First Amendment right of peaceful assembly.[2] After discovery, Defendants sought summary judgment in their favor, arguing that they were entitled to qualified immunity as a matter of law. The District Court denied their motion, concluding based on the record evidence that a rational jury could find that the ban was imposed in retaliation for Frierson "having spoken out against the varsity coach" and that it therefore violated the First Amendment. *Frierson v. Troy City Sch. Dist. Bd. of Educ.*, No. 1:17-CV-44, 2019 WL 2371605, at *3 (N.D.N.Y. June 5, 2019). The District Court determined, moreover, that, if proven, Defendants' acts violated law that was clearly established at the time, relying heavily on our decision in *Johnson v. Perry*, 859 F.3d 156 (2d Cir. 2017). Accordingly, the District Court held, the existence of genuine issues of fact related to why the ban was imposed, for example, precluded the requested dismissal of Frierson's First

---

[2] Frierson also sued the Troy City School District, Coach Bearup, Principal Mariano, and Kathy Ahern (an attorney for the School District). The District Court dismissed those parties from the suit in its summary judgment order, allowing only Frierson's First Amendment claims against Director Reinisch and Superintendent Carmello to proceed.

Amendment claims on qualified immunity grounds. This timely interlocutory appeal then followed.

We have "jurisdiction to review an interlocutory appeal of a denial of qualified immunity when the underlying issues raise only questions of law." *Tooly*, 919 F.3d at 172 (internal quotation marks omitted). Thus, "we may determine whether a defendant is entitled to immunity on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find." *Bolmer v. Oliveira*, 594 F.3d 134, 141 (2d Cir. 2010) (internal quotation marks omitted). But "[i]f a factual determination is a necessary predicate to the resolution of whether immunity is a bar, review is postponed and we dismiss the appeal." *Tooly*, 919 F.3d at 172 (internal quotation marks and alterations omitted).

Where, as here, "a defendant official invokes qualified immunity as a defense in order to support a motion for summary judgment, a court must consider two questions: (1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). With respect to the second prong of the qualified immunity test, "the Supreme Court has repeatedly (and recently) reminded us that clearly established law must be particularized to the facts of the case and must not be defined at a high level of generality." *Naumovski v. Norris*, 934 F.3d 200, 211 (2d Cir. 2019) (internal quotation marks omitted). As a result, "officials only forfeit their immunity when existing precedent has placed the statutory or constitutional question beyond debate and that precedent has been recognized under similar circumstances." *Id.* (alterations, brackets, and internal quotation marks omitted).

We conclude that, at this point in the proceedings, Defendants are not entitled to qualified immunity. It is well-established that the government may not retaliate against individuals for exercising their rights under the First Amendment. *See, e.g.*, *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013); *Blue v. Koren*, 72 F.3d 1075, 1082 (2d Cir. 1995). That is especially true when the government singles out a speaker for disfavored treatment based on the views he or she has expressed. "It is a fundamental principle of the First

Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys. Such discrimination based on viewpoint is an egregious form of content discrimination, which is presumptively unconstitutional." *Ragbir v. Homan*, 923 F.3d 53, 70 (2d Cir. 2019) (internal citations, quotation marks, and brackets omitted).

Moreover, in the specific context of retaliation by a school official restricting access to athletic events, we have said that where, as here, a public school invites parents and other spectators to attend sporting events held in its gymnasium, the gymnasium operates as "a limited public forum" and the school may restrict access to a limited public forum only when (1) "its restrictions are reasonable and viewpoint-neutral," or (2) "there is a clear and present danger of disruptions such as disorder, riot, obstruction of the event, or immediate threat to public safety." *Perry*, 859 F.3d at 175.

In *Perry*, we considered whether qualified immunity protected a high school principal who banned a student's father in early 2013 from attending future sporting events held at the school. Like Frierson, the father in *Perry* was banned after complaining to school administrators that his daughter, a member of the varsity basketball team, wanted to quit the team because the coach was treating her unfairly. *See id.* at 161, 163. When the father learned that school officials were pressuring his daughter to remain on the team, he met with the principal, and the two exchanged heated words. *See id.* at 162–63. The following day, the principal informed the father that he was banned from attending all future school sporting events, purportedly because the father's "verbal altercations, physical intimidation and direct threats to staff ha[d] created an unsafe environment for staff, students and other parents." *Id.* at 163 (internal quotation marks omitted). Shortly thereafter, the father sued, alleging that the ban violated his rights under the First Amendment. *Id.* at 160.

On an interlocutory appeal from the district court's denial of summary judgment, we ruled that the district court was correct in denying qualified immunity to the principal as a matter of law. Based on the father's version of the events, we explained, a rational juror could find that the father "presented no threat of disruption or of harm to anyone"; that the principal's "motive in banning" the father from future sporting events was to punish him for

6

expressing negative views about school administrators; and that the ban was therefore "neither viewpoint-neutral nor reasonable." *Id.* at 175–76. Moreover, we observed, "the right not to be excluded, based on viewpoint differences or because of possible annoyance, from sports events to which the public was invited was clearly established" when the principal banned the father—*i.e.*, in February 2013. *Id.* at 162, 176.

Our decision in *Perry* disposes of Defendants' interlocutory appeal here. As in *Perry*, a rational factfinder could conclude that Frierson did not present a threat of disorder or harm to anyone, especially since Troy High School's January 10 basketball game had taken place without any disruption or incident. Viewing the evidence in the light most favorable to Frierson, as we must at this juncture, a jury could further conclude that Defendants' motivation for imposing the ban was retaliatory: it was to punish Frierson for speaking out against Coach Bearup. Although Defendants assert on appeal that they banned Frierson because they wanted to "protect" the student players from "being upset . . . or engaged by" Frierson, Defs.' Brief 21, a jury could reasonably view that justification as a pretextual, post hoc rationalization of viewpoint discrimination, or unlawful retaliation. Indeed, in his letter informing Frierson of the ban, Director Reinisch did not justify his action on student-safety grounds; instead, he pointed to Frierson's unauthorized entry onto school grounds and his "attempt[s] to organize a protest against [the] coaching staff" as the bases for excluding Frierson from future sporting events. App'x 169. Accordingly, a rational juror could conclude that Defendants violated Frierson's First Amendment rights by retaliating against him and by imposing a ban that was neither viewpoint neutral nor reasonable.

The contours of those rights in the context of a school sporting event, moreover, were clearly established in January 2017, when Defendants imposed the ban on Frierson. In our 2017 decision in *Perry*, we observed that—viewing the evidence in the light most favorable to the father—the principal violated clearly established law when in early 2013 he banned the father from attending school sporting events to punish him for expressing negative views about school administrators. *Perry*, 859 F.3d at 163, 176. Given the close similarity between the facts in *Perry* and those at issue here, we conclude that, under

7

Frierson's version of the events, Defendants' conduct violated law that was clearly established since as early as 2013.

On appeal, Defendants raise two main counterarguments, neither of which is availing. First, Defendants submit that *Perry* is inapposite because it was decided in June 2017, five months after Defendants imposed the ban on Frierson. This argument misunderstands the import of *Perry*, however. We did not recognize a *new* constitutional right in *Perry*. Instead, we explained that "the right not to be excluded, based on viewpoint differences or because of possible annoyance, from sports events to which the public was invited *was clearly established*" when the principal in *Perry* banned the plaintiff father: that is, in February 2013. *Id.* at 163, 176 (emphasis added). Thus, even though our opinion in *Perry* was published after Defendants imposed the ban on Frierson, *Perry* nonetheless shows that Defendants' alleged conduct violated clearly established law. *See Brand v. Casal*, 877 F.3d 1253, 1265 n.10 (11th Cir. 2017) (relying on a case decided after the defendant's alleged violation occurred to show that the defendant's conduct violated clearly established law), *vacated on mootness grounds* (May 1, 2018).

Second, Defendants fault the District Court for denying them qualified immunity based on the presence of disputed facts concerning Defendants' subjective motivations for banning Frierson. Citing the Supreme Court's decision in *Crawford-El v. Britton*, 523 U.S. 574 (1998), Defendants assert that subjective motives are "simply irrelevant to th[e] qualified immunity defense." Defs.' Reply Br. at 8–9 (brackets and internal quotation marks omitted). Accordingly, Defendants contend, it made no difference to the merits of their immunity defense whether the ban was motivated by a (legitimate) desire to protect the players' safety or an (unlawful) intent to punish Frierson for expressing negative views about Coach Bearup.

In so arguing, Defendants misunderstand *Crawford-El* and its progeny. As we explained in *Locurto v. Safir*, "[i]n the usual case where intent is not an element [of the plaintiff's constitutional claim], . . . the qualified immunity doctrine focuses only on whether the government official's actions were objectively reasonable in light of clearly established law, without regard for possible subjective malice." 264 F.3d 154, 169 (2d Cir. 2001). But

8

where a specific illegal intent is an element of the plaintiff's claim, factual disputes over whether the defendant acted with that intent will preclude the district court from granting qualified immunity at the summary judgment stage. *See id.* To hold otherwise, we observed, "would effectively immunize all defendants in cases involving motive-based constitutional torts, so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds." *Id.* (internal quotation marks omitted).

Frierson's First Amendment claim in this case is a motive-based constitutional tort. *See, e.g.*, *Johnson v. Ganim*, 342 F.3d 105, 107, 117 (2d Cir. 2003) (classifying plaintiff's First Amendment claim for retaliatory termination of employment as a "motive-based constitutional tort[]"); *see also Monteiro v. City of Elizabeth*, 436 F.3d 397, 404–05 (3d Cir. 2006) (concluding that "specific intent" was an element of plaintiff's First Amendment claim alleging exclusion from a public meeting). That is, whether the ban violated his First Amendment rights turns on whether Defendants imposed the ban to punish Frierson for expressing dissatisfaction about Coach Bearup or for a viewpoint-neutral reason. *See Locurto*, 264 F.3d at 170 (noting that "[u]nlawful intent" is "a necessary element of plaintiffs' properly framed First Amendment retaliation claim"). Accordingly, the District Court correctly concluded that Defendants were not entitled to qualified immunity at summary judgment in light of the unresolved factual disputes over Defendants' motivation for banning Frierson from future sporting events.

\* \* \*

We have considered Defendants' remaining arguments and conclude that they are without merit. For the foregoing reasons, the District Court's judgment is **AFFIRMED**.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court

9